

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-1-1995

# Brader v Alghny Gen Hosp

Precedential or Non-Precedential:

Docket 94-3578

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Brader v Alghny Gen Hosp" (1995). *1995 Decisions*. Paper 243.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/243

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 94-3578


ALAN H. BRADER,
                    Appellant

v.

ALLEGHENY GENERAL HOSPITAL; GEORGE J. MAGOVERN
             and DANIEL L. DIAMOND


On Appeal from the United States District Court
    for the Western District of Pennsylvania
           (D.C. No. 93-cv-01920)


Argued May 2, 1995

Before:  SLOVITER, Chief Judge, ALITO and
              McKEE, Circuit Judges

(Filed   September 1, 1995)

Michael A. Cassidy (Argued)
Kabala & Geeseman
Pittsburgh, PA 15222

Melvin L. Vatz
Grossinger, Gordon & Vatz
Pittsburgh, PA  15219

        Attorneys for Appellant

David L. McClenahan (Argued)
Paul K. Stockman
Kirkpatrick & Lockhart
Pittsburgh, PA  15222

        Attorneys for Appellees

1

OPINION OF THE COURT


SLOVITER, Chief Judge.

I.

Facts and Procedural History

Appellant Dr. Alan H. Brader challenges the district court's dismissal of his antitrust and breach of contract claims against defendants Allegheny General Hospital, Allegheny Surgical Associates ("ASA"), Cardio-Thoracic Surgical Associates ("CTSA"), Dr. George J. Magovern, and Dr. Daniel L. Diamond. Because the district court dismissed the complaint, the only facts before us are those alleged in the complaint itself.

Allegheny General, a hospital located in Pittsburgh, Pennsylvania, also serves as a regional referral hospital treating patients referred to it from Western Pennsylvania, Eastern Ohio and West Virginia. ASA, a Pennsylvania corporation with offices in Pittsburgh, engages in the practice of general surgery, with principal emphasis in trauma and vascular surgery. Dr. Diamond is the President of ASA and Division Director for General Surgery at Allegheny General. ASA obtains its patients through referrals from other physicians; Allegheny General uses ASA exclusively to perform its trauma service. CTSA, a Pennsylvania corporation that also maintains its offices in Pittsburgh, practices in the field of cardio-thoracic surgery. Dr. Magovern is the President of CTSA and Chairman of the

2

Department of Surgery at Allegheny General. CTSA obtains its patients through physician referrals and from on-call trauma referrals.

In July 1988, Brader, a physician licensed to practice in Pennsylvania and North Carolina, became a provisional staff member of Allegheny General and an employee of ASA. In June 1989, Magovern accused Brader of incompetence and of having improperly rendered trauma treatment to a patient who was on the call service of CTSA (Magovern's group) although the details of Magovern's displeasure are not spelled out in the complaint. According to Brader's complaint, Magovern had no factual basis to support his accusations. Nonetheless, shortly thereafter, when the issue of Brader's advancement from provisional to regular staff status at Allegheny General arose, it was opposed by Magovern. Solely as a result of Magovern's opinion and based on this single issue, Diamond told Brader that he should look elsewhere for employment, that he would not support him for staff membership, that his prior support for Brader had jeopardized his "political" career at Allegheny General, and that Brader could not practice medicine at Allegheny General if he was not employed with ASA.

Sometime after this conversation, Diamond conducted an informal quality assurance study of (presumably Brader's) ruptured abdominal aortic aneurysm (AAA) procedures, which Brader contends was not performed in accordance with Allegheny General's medical staff bylaws. In May 1990 after the study was completed, at a meeting between Brader, Diamond and representatives of

3

Allegheny General, Diamond tried to suspend Brader, allegedly in violation of the bylaws and for no reasonable basis related to the quality of plaintiff's performance.

Later in May, at a meeting of Brader, Magovern and Diamond, Brader agreed to an independent review of his surgical record on AAA procedures. Magovern selected Dr. John Ochsner to conduct it. Brader alleges that Ochsner was a personal friend of Magovern. According to Brader, Diamond, Magovern and Allegheny General submitted inadequate and misleading information to Ochsner for his review. In addition, Brader contends that he was prevented from having an informal conference with Ochsner in violation of the medical staff bylaws.

Ochsner concluded, as a result of the inadequate and misleading information, that Brader's mortality experience was not surprising or unexpected but recommended that his performance of ruptured AAA procedures should be supervised due to excessive morbidity. In October 1990 Magovern summarily suspended Brader's privileges to perform AAA procedures at the hospital without any factual basis. Later that month, Brader's application for advancement to attending staff status at Allegheny General was denied on the recommendations of Diamond and Magovern, and in part at Magovern's recommendation all of Brader's clinical privileges at the hospital were suspended. App. at 58.

Brader appealed all of these adverse actions in accordance with the medical staff bylaws. On October 9, 1991, a hearing panel recommended that the suspension of Brader's ruptured and elective AAA privileges be lifted, but on October

4

25, 1992 a hearing panel recommended that the decision not to advance Brader to attending staff status be sustained, and concluded that Brader's challenge to the suspension of his clinical privileges was moot. App. at 59. According to Brader's complaint, the decision not to advance him to attending staff status violated the medical staff bylaws because it was based on hearsay and he had no opportunity to confront the witnesses against him. App. at 60.

Brader appealed the adverse October 25, 1992 decision to an Appellate Review Panel, which on January 7, 1993 affirmed the recommendation not to advance Brader but concluded that there was no evidence to warrant the continuation of the suspension of Brader's clinical privileges. On February 26, 1993, however, the Allegheny General Board of Directors, allegedly in violation of the medical staff bylaws, reimposed the suspension of Brader's AAA procedures at the hospital.

Brader tried to obtain staff privileges at other hospitals in Allegheny County and Washington County, but he was unable to do so due to his suspension from Allegheny General. Brader contends that defendants' actions have prevented him from practicing medicine in any location within the market area served by the defendants and forced him to relocate his practice to North Carolina.

On November 18, 1993, Brader filed a three-count complaint against defendants alleging claims for violations of sections 1 and 2 of the Sherman Act as well as a claim for breach of contract arising from the alleged violations of the medical

5

staff bylaws. Shortly thereafter, Brader filed an Amended Complaint in order to correct the spelling of Magovern's name.

Defendants moved to dismiss Brader's Amended Complaint arguing that the complaint failed to allege facts sufficient to support the conclusion that Brader had suffered an "antitrust injury" so as to confer standing and that the complaint failed to allege various facts, such as the existence of a conspiracy and the relevant market power of the defendants, to support Brader's claims under the Sherman Act. The defendants also sought to dismiss Brader's claim of breach of contract because the complaint failed to allege which sections of the medical staff bylaws, if any, had been breached, and failed to allege facts sufficient to show that any of the alleged infractions were not merely de minimus violations. Finally, defendants argued that they were immune from suit with respect to all of Brader's claims under the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §§ 11101-11152. Brader sought leave to amend the complaint, and submitted a proposed Second Amended Complaint, and defendants renewed their motion to dismiss, relying upon the same grounds raised in the earlier motion.

By order dated September 14, 1994, the district court dismissed the Amended Complaint, granted Brader leave to amend, ordered the Second Amended Complaint to be filed, and granted defendants' motion to dismiss the Second Amended Complaint. In its accompanying opinion, the district court stated that the Second Amended Complaint contained sufficient allegations regarding a conspiracy and defendants' market power, but "failed

6

to adequately plead that there was an unlawful purpose for the defendants' conduct or that there was an actual anticompetitive effect as a result of plaintiff being denied staff privileges." App. at 13. The district court dismissed Brader's claims under both section 1 and section 2 of the Sherman Act on the ground that the complaint "does not suggest that [the defendants'] action did, or could have, effected [sic] interstate commerce in an anticompetitive manner." App. at 13. The court also dismissed Brader's breach of contract claim, holding that the Second Amended Complaint contained sufficient specific allegations of the bylaw sections allegedly breached by the defendants, but that it failed to allege facts sufficient to support a causal link between those alleged breaches and the injuries suffered by Brader. The district court's opinion did not address the defendants' claim of immunity to Brader's suit under HCQIA.

Brader now appeals the district court's dismissal of his Second Amended Complaint. This court has jurisdiction of Brader's appeal pursuant to 28 U.S.C. § 1291. We have plenary review over a district court's grant of a motion to dismiss. Malia v. General Elec. Co., 23 F.3d 828, 830 (3d Cir.), cert. denied, 115 S. Ct. 377 (1994). In conducting our review, we accept as true all facts alleged in the complaint and all reasonable inferences that can be drawn therefrom. Id.

## II.

## Discussion

A.

7

Brader first contends that the district court erred in concluding that his complaint failed to allege the requisite nexus between the defendants' activities and interstate commerce to support his antitrust claims. There is no dispute that both of Brader's antitrust claims require a showing that the defendants' actions affect interstate commerce. Section 1 of the Sherman Act provides that "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (emphasis added). Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ." 15 U.S.C. § 2 (emphasis added). Moreover, the parties agree that for the purposes of the interstate commerce requirement, there is no distinction between section 1 and section 2 of the Sherman Act. See Weiss v. York Hosp., 745 F.2d 786, 825 n.67 (3d Cir. 1984), cert. denied, 470 U.S. 1060 (1985).

Although the "interstate commerce requirement" of the Sherman Act is often referred to as "jurisdictional," the Supreme Court has held that there is no practical distinction between the "jurisdictional" interstate commerce inquiry and consideration of whether a complaint pleads an effect on interstate commerce sufficient to state a claim for relief under the Sherman Act. In Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 742 &

8

n.1 (1976), the Court stated that an analysis of challenges to antitrust claims based on the interstate commerce element under either Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6) leads to the same result. Similarly, in Weiss we noted that "[the] interstate impact requirement has been construed as an element of both jurisdiction and the substantive offense under the Sherman Act," and that "[t]he inquiry is the same for both elements." 745 F.2d at 824 n.67 (citations omitted); see also Note, Sherman Act "Jurisdiction" in Hospital Staff Exclusion Cases, 132 U. Pa. L. Rev. 121, 126-29 (1983).

Moreover, the Supreme Court has held that the reach of the Sherman Act is as broad as Congress's power under the Commerce Clause. McLain v. Real Estate Bd. of New Orleans, 444 U.S. 232, 241-42 (1980); see also Hospital Bldg. Co., 425 U.S. at 743 n.2; United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 298 (1945). Thus, the interstate commerce requirement of the Sherman Act may be satisfied by demonstrating that defendant's activities either are in interstate commerce or affect interstate commerce. McLain, 444 U.S. at 242.

In Summit Health, Ltd. v. Pinhas, 500 U.S. 322 (1991), the Supreme Court addressed the interstate commerce requirement of the Sherman Act with respect to the attempted exclusion of a physician from a particular geographic market. Pinhas, an ophthalmologist, alleged that a hospital, its corporate owner and its medical staff conspired in violation of section 1 of the Sherman Act to prevent him from providing ophthalmological services in the Los Angeles market by, inter alia, initiating

9

peer review proceedings against him, summarily suspending and terminating his medical staff privileges, and threatening to distribute an adverse report about him to all hospitals in the market area.  Id. at 324, 326-27.

The defendants moved to dismiss the complaint, contending that there was no "factual nexus between the restraint on this one surgeon's practice and interstate commerce."  Id. at 330.  The Supreme Court rejected this argument, stating that the alleged conspiracy, if successful, would cause "a reduction in the provision of ophthalmological services in the Los Angeles market."  Id. at 331.  The Court reasoned that the "competitive significance of [the single physician's] exclusion from the market must be measured, not just by a particularized evaluation of his own practice, but rather, by a general evaluation of the impact of the restraint on other participants and potential participants in the market from which he has been excluded."  Id. at 332.  The Court concluded that the complaint satisfied the interstate commerce requirement of the Sherman Act.  Id. at 333.

Brader argues that the facts of this case are essentially identical to the facts of Summit Health.  In a graphic side-by-side column analysis in his brief, Brader demonstrates that like Pinhas in Summit Health he has alleged that the defendants conspired to suspend his medical privileges through a biased and unfair peer review process.  In addition, as in Summit Health, the alleged effect of the defendants' actions was to deny Brader access to the relevant geographic market, as the hospital's dissemination of the report of his suspension has

10

allegedly prevented him from obtaining another position, causing a reduction in the provision of medical services to the Pittsburgh market. Brader then argues that the district court's conclusion that his complaint failed to allege a sufficient effect on interstate commerce is fundamentally inconsistent with Summit Health.

The district court attempted to distinguish Summit Health on the ground that the dispute in that case arose from the physician's objection to the hospital's costly requirement that eye surgeons absorb the cost of an assistant surgeon during surgical procedures. See Summit Health, 500 U.S. at 326. The district court reasoned that this case involved no similar "systemic anticompetitive effect on interstate commerce," and that because Brader alleges no "market-wide" harm, Summit Health was inapplicable.

The Summit Health opinion is somewhat unclear on whether the interstate commerce nexus was satisfied merely by the defendants' attempt to exclude the plaintiff from the relevant market, or by the fact that the attempted exclusion was coupled with an allegation regarding the defendants' "insist[ence] upon adhering to an unnecessarily costly procedure." Summit Health, 500 U.S. at 332. However, our decision in Fuentes v. South Hills Cardiology, 946 F.2d 196 (3d Cir. 1991), resolved this ambiguity by holding that the mere exclusion of a single physician from a market is sufficient. In Fuentes, a plaintiff physician brought a Sherman Act claim against a hospital and medical group due to the termination of the physician's medical privileges. Fuentes,

11

946 F.2d at 197. When the plaintiff could not obtain another position within or outside of Pennsylvania, he alleged that the defendants were acting in concert to effect an interstate boycott of his services. Id. at 198. There is no suggestion in the Fuentes opinion that Fuentes alleged that the defendants were engaged in anti-competitive pricing practices similar to those alleged in Summit Health; the only alleged anti-competitive effect referred to in Fuentes was the exclusion of the plaintiff physician from the relevant market. Notably, the termination in Fuentes, like the termination in this case, apparently arose over "a disagreement concerning patient care." Id. at 197.

Despite the lack of broader allegations regarding the defendants' anticompetitive motive, we inferred from Fuentes' allegations that he was excluded from practicing in the relevant market and that out-of-state patients who travelled to Pittsburgh would be deprived of Fuentes' services. Id. at 200. Thus, the plaintiff in Fuentes had alleged a sufficient effect on interstate commerce to support his Sherman Act claim. Id. at 201.

The Fuentes opinion forecloses the district court's restrictive reading of Summit Health and controls the "interstate commerce" issue in this case. Brader, like Fuentes, has alleged that the defendants wrongfully terminated his staff privileges at Allegheny General and that such denial limited his ability to serve patients in the relevant market. At the complaint stage no more is required, as defendants conceded at oral argument. Under

12

<u>Fuentes</u>, this allegation is sufficient to satisfy the "interstate commerce requirement" of the Sherman Act.

                                B.

        Defendants next contend that we may affirm the dismissal on any ground presented to the district court, <u>see</u> <u>Langer v. Monarch Life Ins. Co.</u>, 966 F.2d 786, 807-08 (3d Cir. 1992), and that we may do so here because Brader failed to plead facts sufficient to support the conclusion that he suffered an "antitrust injury."  They state that while the district court may have erroneously used the "interstate commerce" label, in effect it concluded that no antitrust injury was pled because Brader's complaint did not allege that defendants' actions had any measurable impact on any market.[1]

        Defendants' argument proceeds along the following steps:  Brader's right to maintain a private cause of action for damages flows from section 4 of the Clayton Act, which provides for suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ."  15 U.S.C. § 15(a).  This requires proof that the plaintiff suffered an "antitrust injury" before recovering

---

[1]  Judge Alito would not reach the question addressed in part IIB of this opinion.  He does not think that the district court's decision was based on the question of antitrust injury. Thus, in his view, part IIB addresses a possible alternative ground for affirmance and, as a discretionary matter, he would not reach that question now.  The question is a difficult one --compare part IIB with <u>BCB Anesthesia Care v. Passavant Memorial Area Hosp.</u>, 36 F.3d 664, 669 (7th Cir. 1994); <u>Lie v. St. Joseph Hosp.</u>, 964 F.2d 567, 570 (6th Cir. 1992) -- and he thinks that it would be preferable for the question to be decided in the first instance by the district court.

                               13

damages for that violation. See Atlantic Richfield Co. v. USA Petroleum Co, 495 U.S. 328, 339 (1990); Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc., 429 U.S. 477, 489 (1977). According to defendants, this "antitrust injury" rule requires that Brader plead facts to support the inference that defendants caused an injury to competition, which in turn injured Brader. Defendants contend that this requirement is far more stringent than the mere "jurisdictional" requirement of the interstate commerce test, and that therefore Summit Health and Fuentes do not resolve the issue in this case.

Defendants' argument, even if not implausible, appears to be flatly inconsistent with Fuentes. There too we considered whether the complaint of a physician whose hospital privileges were allegedly terminated at the request of physicians with whom he had been associated stated a claim for relief under the Sherman Act. Fuentes had alleged that "the defendants acted in concert to deny Fuentes, a provider of cardiological services, access to the Pittsburgh cardiological market," and that "by eliminating him as a competitor, the boycott successfully reduced competition for the defendants' cardiological services." Fuentes, 946 F.2d at 202. Accepting as true Fuentes' allegations and all reasonable inferences therefrom we concluded that these allegations were sufficient to survive a motion to dismiss, as "such an exclusion constitutes an unlawful restraint of trade." Id.; see also Boczar v. Manatee Hosps. & Health Sys., Inc., 993 F.2d 1514, 1519 (11th Cir. 1993) (hospital's actions in

14

suspending the plaintiff's privileges "had the effect of restraining trade").

Brader's Second Amended Complaint alleges that the defendants' activities "prevent[ed] the Plaintiff and others from engaging in the practice of general vascular trauma surgery in the relevant market, and . . . prevent[ed] other hospitals in the relevant market from employing or granting medical staff privileges to the Plaintiff for the purpose of competing with defendants." App. at 64. This conduct, Brader alleges, has "prevent[ed] competition in the relevant product market within the relevant geographic market." App. at 64. Under Fuentes, these allegations are sufficient to state a claim for an antitrust injury.

We are not in a position to predict whether Brader will ultimately be able to sustain his burden of proof on this issue since Brader has not yet had an opportunity to obtain evidence. After Summit Health, the adequacy of a physician's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial. See, e.g., Lie v. St. Joseph Hosp., 964 F.2d 567, 570 (6th Cir. 1992) (affirming summary judgment where physician failed to show "an injury to competition in the form of increased cost or reduced supply of services or harm to the consumer"); Tarabashi v. McAlester Regional Hosp., 951 F.2d 1558, 1571 (10th Cir. 1991) (affirming judgment against physician after trial in part because physician "failed to establish the required impact upon competition") (emphasis in original), cert. denied, 112 S. Ct.

15

2996 (1992); Oksanen v. Page Memorial Hosp., 945 F.2d 696 (4th Cir. 1991) (in banc) (affirming summary judgment for hospital and medical staff after physician had "received adequate discovery on the key issues" on his claim of antitrust violations arising from alleged misuse of peer review process), cert. denied, 502 U.S. 1074 (1992).

Even the antitrust cases cited by defendants that do not involve physicians suggest that the existence of an "antitrust injury" is not typically resolved through motions to dismiss. See, e.g., Atlantic Richfield Co., 495 U.S. at 346 (finding plaintiff had "failed to demonstrate that it has suffered any antitrust injury" at summary judgment stage); Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 495 (3d Cir.) (in banc) (addressing "antitrust injury" issue in summary judgment context), cert. denied, 113 S. Ct. 196 (1992); Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 727–28 (3d Cir. 1991) (resolving "antitrust injury" issue on appeal of denial of motion for judgment notwithstanding the verdict), cert. denied, 112 S. Ct. 3034 (1992).

We recognize that one court of appeals has upheld the dismissal for failure to state a claim in an antitrust complaint filed by nurse anesthetists alleging a conspiracy between a hospital and physicians to terminate plaintiffs' contract for services. See BCB Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Ass'n, 36 F.3d 664, 668–69 (7th Cir. 1994). The district court based the dismissal on plaintiffs' failure to allege a sufficient nexus with interstate commerce, a rationale

that the appellate court did not accept. Instead, the court of appeals, in a divided opinion, upheld dismissal of the complaint stating that "[a] staffing decision does not itself constitute an antitrust injury," id. at 669, notwithstanding that the hospital was the only acute care general hospital within twenty-five miles, which substantially limited plaintiffs' options. Id. at 668. The court recognized that the substitution of medical physician anesthetists might cause "the prices the hospital charges [to] be somewhat higher now than they were." Id. The BCB majority even acknowledged that the antitrust injury issue is one that is typically reserved for summary judgment. Id. As the dissent in BCB noted, it is difficult to reconcile the majority's conclusion with Summit Health. Id. at 669 (Cudahy, dissenting).

The BCB majority stressed the inconvenience to the courts of proceeding beyond the pleading stage and noted the "hundreds or thousands of pages" of decisions in antitrust cases decided after discovery in which the plaintiff physicians have ultimately been unsuccessful. Id. at 667. We believe that such impatience with the notice pleading embodied in the Federal Rules is foreclosed by the Supreme Court's decision in Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 113 S. Ct. 1160, 1163 (1993) (rejecting a "heightened pleading standard" in a case arising under 42 U.S.C. § 1983), and is an issue to be addressed, if needed, by Congress. We decline to adopt the BCB majority approach here.

Defendants' argument that Brader is a "poor champion of consumers" is essentially the same argument. They take the quote

17

from a case decided after discovery in which we upheld the judgment because of the plaintiff's failure to show that its loss of sales was sufficiently related to the anticompetitive activity alleged. See Alberta Gas Chems. Ltd. v. E.I. du Pont de Nemours & Co., 826 F.2d 1235, 1239 (3d Cir. 1987)(quoting Ball Memorial Hosp. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1334 (7th Cir. 1986)), cert. denied, 486 U.S. 1059 (1988). They also rely on Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1454 (11th Cir. 1991), which affirmed summary judgment against the plaintiff physician who had not even argued that his exclusion from the market hurt competition and increased prices for consumers, but instead sought an injunction so that he could join a virtual monopoly and share in the physicians' supercompetitive profits. In contrast, the type of injury alleged by Brader (the loss of income due to an inability to practice in the relevant market area) is directly related to the illegal activity in which the defendant allegedly engaged: a conspiracy to exclude Brader from the relevant market.

Under Summit Health and Fuentes, Brader's pleading requirement on this issue is satisfied by his allegation that the defendants unreasonably restricted his ability to practice in the Pittsburgh area and thereby "successfully reduced competition" for the defendants' services. See Fuentes, 946 F.2d at 202. We therefore reject defendants' argument regarding the adequacy of Brader's pleading of an "antitrust injury" and decline to affirm the dismissal of his claim on this ground at this stage of the litigation.

18

C.

Defendants contend that we should affirm the decision of the district court on the alternative ground that the Second Amended Complaint fails to contain sufficient allegations regarding the defendants' market power. Market power may be relevant in some Sherman Act section 1 claims but it is an essential factor to be considered in all Sherman Act section 2 claims. Neither the parties nor the district court make the distinctions necessary to analyze those two sections, and we are unwilling to affirm on this ground in the absence of any consideration by the district court. We briefly set forth the distinctions, as the issue will inevitably arise on remand.

Under section 2 of the Sherman Act, Brader must show, at a minimum, that defendants have "a dangerous probability of achieving monopoly power" in the relevant market. Spectrum Sports, Inc. v. McQuillan, 113 S. Ct. 884, 890-91 (1993); see also Pastore v. Bell Telephone Co., 24 F.3d 508, 512 (3d Cir. 1994). Although disposition of that question is typically one that is not resolved at the pleading stage unless it is clear on the face of the complaint that the "dangerous probability" standard cannot be met as a matter of law, the complaint should allege viable relevant markets. Brader's complaint is not specific as to either the product market or the relevant geographic market. In his count alleging violation of section 2, he refers to the product market as "the practice of certain specialized vascular and trauma surgery and cardio-thoracic surgery at [Allegheny General]." App. at 66. Elsewhere the

19

complaint states that "the geographic extent of [the market from which he was excluded] is co-existent with the area from which the defendants attract their patients which will be further defined through discovery." App. at 63. It appears that Brader suggests two geographic markets, one confined to the hospital and the other encompassing a portion of the tri-state area.

We do not decide whether under these circumstances Allegheny General is an appropriate geographic market, but we note that every court that has addressed this issue has held or suggested that, absent an allegation that the hospital is the only one serving a particular area or offers a unique set of services, a physician may not limit the relevant geographic market to a single hospital. See, e.g., Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 480 n.5 (7th Cir.) (physician was "slicing the geographic market much too thin" in limiting market to one hospital), cert. denied, 488 U.S. 852 (1988); Seidenstein v. National Medical Enterprises, Inc., 769 F.2d 1100, 1106 (5th Cir. 1985) (no evidence that the hospital "is recognized as a separate and distinct market, or that unique services or facilities existed there"); Dos Santos v. Columbus-Cuneo-Cabrini Medical Ctr., 684 F.2d 1346, 1353 (7th Cir. 1982) (noting that "we have reason to doubt whether the relevant market can be sliced so small as to embrace only a single hospital"); Flegel v. Christian Hosp. Northeast-Northwest, 804 F. Supp. 1165, 1174 (E.D. Mo. 1992) (limiting the relevant geographic market to one hospital lacked any "reasonable legal or factual basis"), aff'd, 4 F.3d 682 (8th Cir. 1993); Drs. Steuer & Latham P.A. v.

20

National Medical Enterprises, Inc., 672 F. Supp. 1489, 1514 (D.S.C. 1987), aff'd, 846 F.2d 70 (4th Cir. 1988); Friedman v. Delaware County Memorial Hosp., 672 F. Supp. 171, 195 (E.D. Pa. 1987), aff'd, 849 F.2d 600 (3d Cir. 1988).

On the other hand, there is some suggestion in the complaint and in the briefs that Allegheny General may offer unique trauma and vascular surgery services in the broader geographic tri-state area served by Allegheny General. We leave for the district court whether the complaint makes a colorable claim that the defendants have "a dangerous probability of achieving monopoly power" over the relevant product in that area.

In contrast, under section 1 of the Sherman Act the defendants' "market power" is relevant only to the extent that it is a factor in the determination of the reasonableness of the restraint. See e.g., Oksanen, 945 F.2d at 709. Defendants have not presented any case holding that the precise scope of that "market power" must be specifically pled in the complaint to support the type of section 1 claim at issue here. Neither Summit Health nor Fuentes so suggested. Therefore, we decline to accept defendants' suggestion that we affirm on this alternative ground.

D.

Brader alleged a breach of contract claim asserting a series of violations by the defendants of the medical staff bylaws. The district court dismissed this claim on the ground that the complaint failed to allege a connection between the alleged breaches and the losses suffered by Brader. In

21

particular, the district court found that Ochsner's independent review of Brader's record superseded the alleged breach committed by Diamond in conducting the informal quality assurance review, that Diamond's unsuccessful attempts to suspend Brader unilaterally could not have caused Brader any damage, and that Brader had relocated to North Carolina before the reimposition of his suspension by the hospital in February 1993, and therefore the reimposed suspension could not have caused his losses.

Brader argues that the district court erred in assuming that he would have been suspended regardless of any breach of the bylaws and that he has not suffered any economic damages as a result. These conclusions, Brader reasons, are factual and should not be the basis of a dismissal order under Rule 12(b)(6).

The parties agree that, under Pennsylvania law, the Allegheny General medical staff by-laws constitute an enforceable contract between a hospital and members of its medical staff. See Miller v. Indiana Hosp., 419 A.2d 1191, 1193 (Pa. Super. Ct. 1980). In order to state a claim for damages arising from a breach of contract, a plaintiff must also plead damages resulting from the alleged breach. See General State Auth. v. Coleman Cable & Wire Co., 365 A.2d 1347, 1349 (Pa. Commw. Ct. 1976). This is a natural extension of the general rule that damages for breach of contract are not recoverable unless there is a "causal relationship between the breach and the loss." See Robinson Protective Alarm Co. v. Bolger & Picker, 516 A.2d 299, 303 n.9 (Pa. 1986).

22

Brader's complaint adequately alleges the requisite causal connection. The complaint alleges that the defendants' breach of the bylaws caused him to suffer damages such as the loss of income that he would have had at Allegheny General, loss of personal and professional reputation, emotional distress, expenses for a new job search and the costs of appeals. We cannot assume that if Brader had been given the benefit of the protections of the bylaws and been able, for example, to confront the witnesses against him, he would not have been able to successfully demonstrate the inadequacies of the case against him. In fact, he did convince the Appellate Review Panel that there was no evidence to warrant the continued suspension of his clinical privileges.

The district court apparently assumed that, absent the alleged breaches, Brader still would have lost his position at Allegheny General. Its discussion on this issue is cursory, but if the court based its conclusion on the results of Ochsner's allegedly independent review, the court failed to take into account that Brader has pled that Ochsner's review also failed to comply with the bylaws.

We therefore will reverse the district court's dismissal of Brader's breach of contract claims. The allegations in the complaint allege a sufficient causal nexus between the alleged breaches and the damages suffered by Brader to support a cause of action under Pennsylvania law.

E.

23

Finally, defendants contend that this court should affirm the district court's order of dismissal due to Brader's failure to allege properly that defendants are not immune from suit under the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §§ 11101-11151. The HCQIA provides that parties to a professional review body shall not be liable for damages where the actions are taken "(1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirements of paragraph (3)." 42 U.S.C. §§ 11111(a)(1), 11112(a).

Under the HCQIA, professional review actions are presumed to meet the required standard unless that presumption is "rebutted by a preponderance of the evidence." 42 U.S.C. §11112(a). This provision necessarily implies that plaintiffs bear the burden of proving noncompliance with these standards. See Bryan v. James E. Holmes Regional Medical Ctr., 33 F.3d 1318, 1333 (11th Cir. 1994) (reviewing district court's denial of defendants' motion for judgment as a matter of law on the issue of HCQIA immunity), cert. denied, 115 S. Ct. 1363 (1995). It also implies some opportunity to discover relevant evidence. See Smith v. Ricks, 31 F.3d 1478, 1485 (9th Cir. 1994) (suggesting

24

that the "reasonableness" requirements of HCQIA may be addressed through a motion for summary judgment), cert. denied, 115 S. Ct. 1400 (1995).

On appeal, defendants focus on the adequacy of Brader's pleadings regarding defendants' HCQIA immunity, arguing that the complaint's recitation of the language of HCQIA is insufficient to support an absence of HCQIA immunity. However, Brader made extensive allegations regarding alleged improprieties by physicians participating in Allegheny General's peer review process. If Brader's allegations, such as the alleged failure to provide Brader with fair hearing procedures, are true, the defendants would not be entitled to HCQIA immunity. We therefore decline to affirm the district court's dismissal of Brader's claims on the alternative grounds of HCQIA immunity.

We understand that the HCQIA was enacted at least in part to protect hospitals and other care providers from the type of frivolous suit complaining about staffing decisions that concerned the court in BCB. Moreover, we also are concerned that health care providers may be deterred by the expense of litigation from promptly terminating the privileges of physicians and other employees who the hospital believes are not competent to discharge the life and death decisions for which they have responsibility. On the other hand, these considerations cannot justify the judiciary in pretermitting consideration of the application of the antitrust laws to the health care field, particularly now that the provision of health services is becoming increasingly concentrated and the opportunities for

25

physicians more limited.  Once the plaintiff has alleged that the defendants have failed to satisfy the requirements of HCQIA immunity, we can only rely on the Federal Rules of Civil Procedure, particularly the obligations of parties and attorneys under Rule 11, to stem the tide of lawsuits subsequently held to be without factual or legal foundation.

## III.

### Conclusion

For the foregoing reasons, we will reverse the district court's dismissal of Brader's claims and remand for proceedings consistent with this opinion.