**CSR LIMITED and CSR America Inc., Plaintiffs,**

v.

**FEDERAL INSURANCE CO., et al., Defendants.**

**No. Civ. 95–2947 (HAA).**

United States District Court, D. New Jersey.

Oct. 9, 1998.

**560**

Gita F. Rothschild, McCarter & English, LLP, Newark, NJ, Mark F. Rosenberg, Sullivan & Cromwell, New York City, for plaintiffs.

Joseph R. McDonough, Graham, Curtin & Sheridan, Morristown, NJ, Paul R. Koepff, Rosemary B. Boller, O'Melveny & Myers LLP, New York City, for defendants CIGNA Corporation, Insurance Company of North America, CIGNA Insurance Asia Pacific Ltd., Insurance Company of North America (U.K.) Ltd., and CIGNA Insurance Company of Europe SA–NV.

Kevin T. Coughlin, McElroy, Deutsch & Muvaney, Morristown, NJ, for certain Australian and European defendant Insurers and certain defendant London Market Companies and Syndicates Subscribing to Portions of Lloyds of London Policies, as more particularly specified in Exhibit A attached to the Notice to Dismiss Plaintiff's Complaint.

William P. Shelly, Cozen & O'Connor, Philadelphia, PA, for defendants Federal and Vigilant Insurance Companies.

## OPINION

ACKERMAN, District Judge.

This matter comes before the court on a motion by defendants to dismiss plaintiffs' antitrust claims, Counts V and VI of plaintiffs' complaint, for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In short, plaintiffs allege that defendant insurers engaged in a group boycott when they collectively refused to write plaintiffs a new insurance policy unless plaintiffs withdrew a request for coverage of 95,000 asbestos-related claims which plaintiffs contend were covered under a previous policy written by the defendants. Defendants have moved to dismiss plaintiffs' antitrust claim asserting that plaintiffs have failed to state a cause of action under federal and New Jersey antitrust laws. For the reasons detailed below, defendants' motion is **DENIED**.

### I. Motion to Dismiss Standard

When determining whether a complaint should be dismissed for failure to state a claim upon which relief can be granted, the court must consider only those facts alleged in the complaint and accept all of the allegations as true. See ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) (citing Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief, the complaint should not be dismissed. See id. (citing Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Furthermore, when reviewing a complaint, in addition to the allegations contained in the complaint itself, a court should consider the exhibits attached to it, incorporated in the complaint pursuant to Federal Rule of Civil Procedure 10(c). See id. Lastly, a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense appears on its face. See id.

## II. Factual Background

Plaintiffs CSR Limited and CSR America Inc. (collectively referred to herein as "plaintiffs") filed the First Amended Complaint in this action against Federal Insurance Co., et al. on October 22, 1997. In the First Amended Complaint, plaintiffs assert claims for breach of contract, bad faith denial of coverage, tortious interference with contractual relations, tortious interference with prospective economic advantage, violation of section 1 of the Sherman Act, and violation of title 56, section 9–3 of the New Jersey Statutes Annotated. Plaintiffs also seek declaratory and injunctive relief. For purposes of this motion by defendants to dismiss plaintiffs' antitrust claims, Counts V and VI of the First Amended Complaint, the relevant facts as alleged in the complaint are as follows.

Plaintiff CSR Limited ("CSR"), an Australian public company, is a diversified entity engaged in various businesses, including the sugar and building materials businesses. Plaintiff CSR America Inc. ("CSR America"), a Georgia corporation, is an indirect, wholly owned U.S. subsidiary of CSR and a holding company with subsidiaries engaged in construction materials businesses.

Defendant CIGNA Corporation ("CIGNA"), a Delaware corporation with its principal place of business in Pennsylvania, is the parent of CIGNA Insurance Asia Pacific Ltd. ("CIGNA IAP"), an Australian public company with its principal place of business in Sydney, Australia, and Insurance Company of North America ("INA"), a Pennsylvania corporation, licensed to do business in New Jersey. INA allegedly issued the first policy relevant to this action. CIGNA IAP also issued primary and excess general and products liability coverage to CSR.

Plaintiffs assert that additional underwriters, which they refer to as "Other Underwriters," provided primary and excess liability coverage to CSR. According to plaintiffs, some of the excess policies were Lloyd's of London policies that were sold through Lloyd's of London syndicates. Plaintiffs refer to the insurance companies participating in those syndicates as "Lloyd's Insurers."

Plaintiffs assert in their complaint that defendants "CIGNA Australia and/or INA acted as 'Lead Underwriter' for all of CSR's primary policies and many of its excess policies beginning November 2, 1978." Complaint ¶ 13. Plaintiffs further allege that defendant CIGNA ultimately organized the boycott against plaintiffs at issue in this action.

From approximately 1948 until 1966, CSR, acting as a sales agent for one of its subsidiaries, sold asbestos fiber to companies in the United States. Plaintiffs assert that while CSR America did not participate in CSR's sale of asbestos, thousands of U.S. asbestos bodily injury claims have been filed against it. Plaintiffs allege that many of the insurance policies issued to CSR name CSR America as an additional insured and that CSR America is covered under these policies when sued as an alter ego for CSR. In total, 95,000 claims have been filed against plaintiffs. Plaintiffs have spent more than $82 million in defense and settlement of such claims.

On November 29, 1991, CSR wrote a letter (the "1991 Claims Letter") to CIGNA Australia and its other insurers requesting coverage for the asbestos-related claims which had been asserted against plaintiffs ("1991 Claims"). Plaintiffs allege that CSR had previously informed CIGNA of such claims, but that CIGNA had "taken the position" that the claims were not covered under the CIGNA policies. Complaint ¶ 27. During that same period, CSR sought to renew its general and products liability coverage for U.S. and other claims for the year commencing March 1992.

Plaintiffs allege that on December 4, 1991, CIGNA "purportedly acting on behalf of itself and Other Underwriters" sent CSR's insurance broker, Richard Oliver

International Pty., Ltd. ("Richard Oliver"), a letter stating that:

> CIGNA finds it inopportune to discuss any proposal to consider renewal or review of existing [l]iability programme for C.S.R. Limited [because] the Legal Department of C.S.R. has lodged with us serious claims relating to compensation paid by C.S.R. and monies that may be payable in the future to persons suffering asbestos related conditions as a result of the inhalation of asbestos fibres.

Complaint ¶ 29. Despite this initial statement, and after further conversations with CSR, CIGNA agreed that renewal of the policy and the 1991 Claims Letter should be considered separately. On February 24, 1992, however, CIGNA informed CSR through Richard Oliver that " 'CIGNA's head office in the U.S. (Legal Department)' had to sanction the offer of renewal to CSR." Complaint ¶ 31.

According to the plaintiffs, "CIGNA then caused CIGNA Australia, purportedly on behalf of itself and Other Underwriters, to threaten CSR with non-renewal as long as CSR pressed for coverage of the Asbestos Claims under earlier policies." Complaint ¶ 32. By facsimile dated March 6, 1992, and after a telephone conversation with a representative of CIGNA, Richard Oliver informed CSR that, "the current line of thought from CIGNA and other underwriters is that if ... there is not an *unconditional* withdrawal of the claims notified to the Underwriters in November 1991 then notice of cancellation will be issued on Thursday, 12 March 1992 and no cover[age] will exist beyond due date (31 March 1992). ( [e]mphasis [in] original)." Complaint ¶ 32. In the same fax Richard Oliver also stated:

> Whilst we are continuing to seek alternate markets you should be aware that given the extremely broad nature and scope of the existing wording and the number of insurers/reinsurers involved in the program over the years that alternative insurers are few in number.

Complaint ¶ 32. Plaintiffs allege that they "sought coverage from alternate insurers, including Aegon and other insurers in the London Market." Complaint – 33. CIGNA, through Richard Oliver, informed plaintiffs that Michael Payne & Others, a broker for Lloyd's which was involved in the placement of the Lloyd's coverage and reinsurance coverage for CSR's policies, advised that there was no support for new coverage in the London market until CSR withdrew its previous claims.

Furthermore, in March of 1992, a representative from CIGNA informed Richard Oliver that he had spoken with Michael Payne in London and to the CIGNA head office in Philadelphia, both of which " 'confirmed ... that there is absolutely no support whatsoever for an extension of the ... 1992 policy, even for a period of one month, until the current problems are resolved;' and that 'unless there was an unconditional withdrawal of the claims lodged upon CIGNA and the insurers/reinsurers by Thursday, 12 March 1992 that CIGNA would proceed with notice of cancellation and there would be no offer of renewal terms.' " Complaint ¶ 34. Richard Oliver also informed CSR that "no other insurer was willing to consider coverage for CSR as long as CSR was asserting [the] asbestos coverage claims.... Despite an initial expression of interest, Aegon later informed Richard Oliver that it would not 'rock the boat.' " Complaint ¶ 35.

Plaintiffs allege that, fearing they would be without general and products liability coverage essential to their business, CSR wrote a letter withdrawing their 1991 Claims. Thereafter, CIGNA and Other Underwriters agreed to issue CSR general and products liability insurance containing exclusions for claims based on asbestos-related diseases for the 1992–1993 term.

## III. Discussion

Defendants argue that plaintiffs have failed to allege facts sufficient to assert an antitrust claim under section 1 of the Sher-

man Act and corresponding New Jersey law, title 56, section 9–3 of the New Jersey Statutes Annotated. "[T]o sustain a cause of action under section 1 of the Sherman Act, 15 U.S.C. § 1 (1982) a plaintiff must allege three elements: a contract, combination or conspiracy; a restraint of trade; and an effect on interstate commerce." *Fuentes v. South Hills Cardiology*, 946 F.2d 196, 198 (3d Cir.1991). In support of their motion, defendants make two arguments. First, defendants assert plaintiffs failed to allege a restraint of trade. Second, defendants contend that in addition to the pleading requirements set forth in *Fuentes*, plaintiffs must specifically plead antitrust injury and have failed to do so. The court will address each argument in turn.

## A. Restraint of Trade

In their complaint, plaintiffs allege that defendants engaged in a group boycott which unlawfully restrained trade. Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal." 15 U.S.C. § 1. Recognizing early on that such broad language would render nearly all business agreements unlawful, the Supreme Court, beginning in *Standard Oil v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), has construed the Act to be prohibitive only of conduct which "unreasonably" restrains trade. *See United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir.1993). As the Supreme Court stated in *FTC v. Indiana Fed'n of Dentists:*

> [A] restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be "per se" unreasonable, or because it violates what has come to be known as the "Rule of Reason," under which the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition

or whether it is such as may suppress or even destroy competition".

476 U.S. 447, 457, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (quoting *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918)).

"A classic group boycott involves 'concerted action with a purpose either to exclude a person or group from the market, or to accomplish some other anticompetitive object, or both.'" *Fuentes*, 946 F.2d at 202 (quoting *Pennsylvania ex. rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 183 (3d Cir.1988)). Group boycotts have often been categorized as behavior warranting per se treatment. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 293, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (citing numerous Supreme Court cases). In *Northwest Wholesale Stationers*, however, the Supreme Court cautioned that not all group boycotts mandate per se condemnation. *See id.* at 294, 105 S.Ct. 2613. The Court stated that:

> Cases to which this court has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." In these cases the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete, and frequently the boycotting firm possessed a dominant position in the relevant market. In addition, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.

*Id.* at 294–95, 105 S.Ct. 2613 (citations omitted). The Court pointed out, however, that a group boycott need not possess all

of the above elements to be adjudged per se unreasonable. *See id.* at 295, 105 S.Ct. 2613. In addition, the Court stated that, "... the decision to apply the per se rule turns on 'whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output' ... or instead one designed to 'increase economic efficiency and render markets more, rather than less competitive.'" *Id.* at 289–90, 105 S.Ct. 2613.

■ Under the Rule of Reason, the plaintiff bears the initial burden of demonstrating that defendants' conduct "... produced anti-competitive effects within the relevant product and geographic market. The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects, such as reduction of output, increase in price or deterioration in the quality of goods and services." *Brown Univ.*, 5 F.3d at 668 (citations omitted). Since proving actual anticompetitive effects is often difficult, courts have allowed plaintiffs to satisfy their burden through proof of defendant's "market power". *See id.* at 669. If the plaintiff meets this initial burden, the defendant must then show that the conduct "promotes a sufficiently pro-competitive objective." *Id.* at 669. The plaintiff can then rebut by showing that the restraint is unnecessary to achieve the procompetitive objective. *See id.* at 669.

In *Federal Trade Com'n v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), the Court declined to categorize as per se unreasonable the refusal by a federation of dentists to provide their patients' insurers with x-rays as requested by the patients. The Court held, however, that finding such behavior unreasonable under a Rule of Reason analysis was not a difficult task. *See id.* at 459, 106 S.Ct. 2009. The Court stated:

> The Federation's policy takes the form of a horizontal agreement among participating dentists to withhold from their customers a particular service that they

desire—the forwarding of x-rays to insurance companies along with claim forms. "While this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." A refusal to compete with respect to the packages of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement impairs the ability of the market to advance social welfare by ensuring the provision of desired goods and services to consumers at a price approximately the marginal cost of providing them.

*Id.* at 459, 106 S.Ct. 2009. The Court then concluded that, "absent some countervailing procompetitive virtue—such as, for example, the creation of efficiencies in the operation of a market or the provision of goods and services—such an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place' cannot be sustained under the Rule of Reason." *Id.* at 459, 106 S.Ct. 2009.

In the instant case, the essence of defendants' argument is as follows: plaintiffs' "bare bones" pleading implies they are asserting that the court should use the per se analysis when evaluating whether defendants' alleged conduct restrains trade. Defendants assert that the plaintiffs, however, have failed to allege conduct which can be categorized as per se unreasonable and, thus, the court must assess the alleged conduct under the Rule of Reason. Defendants then spend much of their brief and reply brief arguing that plaintiffs fail to allege facts necessary to establish that the restraint of trade was unreasonable under the Rule of Reason.

■ At this early stage of the proceeding, the court does not find it necessary to determine which mode of analysis it will ultimately employ in evaluating the defendants' activities. *See Fuentes,* 946 F.2d 196; *Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 876 (3d Cir.1995); *Swarthmore Radiation Oncology, Inc. v. Lapes,* 812

F.Supp. 517, 520 (E.D.Pa.1992) ("[The court] need not decide, at this stage of the proceedings, whether a per se or a 'rule of reason' applies."). Without discovery, the court can not make a decision as to whether the conduct alleged is such as would "always or almost always tend to restrict competition and decrease output" and is, thus, per se unreasonable. *See Northwest Wholesale Stationers*, 472 U.S. at 289–90, 105 S.Ct. 2613. Furthermore, the court finds that discovery is necessary to make a determination as to the reasonableness of the defendants' activities under the more lenient, but more fact intensive, Rule of Reason. Additional facts are necessary for determining whether defendants' conduct "merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Indiana*, 476 U.S. at 457, 106 S.Ct. 2009.

■ For purposes of surviving defendants' motion to dismiss under 12(b)(6), however, the court finds that, accepting all facts alleged as true and making all inferences in favor of plaintiffs, plaintiffs have alleged conduct on the part of the defendants which can not be found to be reasonable as a matter of law. Defendants' refusal to issue plaintiffs a new insurance policy unless the 1991 Claims were withdrawn is not conduct which, on its face, promotes competition. Rather, such conduct appears to have eliminated competition within the market for general and products liability insurance with respect to plaintiffs. Such behavior may be construed as disruptive to the "ordinary give and take of the marketplace." *Indiana*, 476 U.S. at 459, 106 S.Ct. 2009. Furthermore, based upon facts alleged, no procompetitive objective can be attached to defendants' conduct.

The court finds that defendants' conduct can not be adjudged reasonable as a matter of law and, therefore, plaintiffs have alleged facts sufficient to survive a motion to dismiss with respect to restraint of trade.

**B. Antitrust Injury**

Defendants also assert that plaintiffs must plead antitrust injury to survive defendants' 12(b)(6) motion and that plaintiffs have failed to do so. "In antitrust cases, a plaintiff must prove 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' conduct unlawful.'" *Mathews v. Lancaster*, 87 F.3d 624, 641 (3d Cir.1996) (quoting *Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1240 (3rd Cir.1987)). Third Circuit precedent, however, indicates that antitrust injury need not be plead separately to state a claim under section 1 of the Sherman Act, *see Fuentes*, 946 F.2d at 198, and that an analysis of antitrust injury is more appropriate after discovery has been conducted. *See Brader*, 64 F.3d at 876.

As stated above, in *Fuentes*, a group boycott case appealing the grant of a 12(b)(6) motion to dismiss, the Third Circuit set forth the pleading requirements of a section 1 Sherman Act claim. 946 F.2d at 198 The plaintiff in *Fuentes*, a cardiologist, filed suit under section 1 of the Sherman Act alleging a cardiology center, a hospital and five individual physicians conspired to terminate his medical privileges. *Id.* at 196. "When [Fuentes] could not obtain another position within or outside of Pennsylvania, he alleged that the defendants were acting in concert to effect an interstate boycott of his services." *Brader*, 64 F.3d at 874. The *Fuentes* Court did not require the plaintiff to separately plead antitrust injury, but rather found that plaintiffs claim could not be dismissed if the plaintiff adequately plead "a contract, combination or conspiracy; a restraint of trade; and an effect on interstate commerce," which the court ultimately found that he had. 946 F.2d at 198.

In *Brader*, the Third Circuit indicated that whether plaintiff suffered antitrust injury is an issue more appropriately resolved after discovery has been conducted.

64 F.3d at 876. The *Brader* Court relied on the factual similarities between the case before it and *Fuentes* (*Brader* also involved an alleged group boycott against a particular physician) in finding that the plaintiff had adequately "state[d] a claim for antitrust injury." *Id.* at 877. The Court, however, found that "the adequacy of a physician's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial." *Id.* at 877. The Court then went on to state that "... even antitrust cases cited by defendants that do not involve physicians suggest that the existence of an 'antitrust injury' is not typically resolved through a motion to dismiss." *Id.* at 877.

Following *Brader*, this court finds that an analysis of antitrust injury would be more properly conducted after discovery. Plaintiffs have satisfied the pleading requirements set forth in *Fuentes* and, thus, defendants' motion must be denied.

### C. New Jersey Antitrust Claim

Defendants have moved for a dismissal of plaintiffs' New Jersey antitrust claim for failure to state a claim on which relief can be granted. The relevant New Jersey statute states: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." N.J.Stat.Ann. § 56:9–3 (West 1998). New Jersey "antitrust provisions are patterned after the Sherman Act, and [New Jersey courts have] previously acknowledged the significance of federal antitrust decisions in the interpretation of [New Jersey] antitrust law." *Monmouth Chrysler–Plymouth, Inc. v. Chrysler Corp.*, 102 N.J. 485, 509 A.2d 161, 166 (1986). As defendants state, "the relevant New Jersey statute could not be any more clear" in indicating that New Jersey courts follow federal antitrust decisions when interpreting New Jersey Antitrust law. *See* Defendants' Brief in Support of Motion to Dismiss Counts V and VI of the First Amended Complaint,

at 22. The New Jersey statute states, "This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it." N.J.Stat.Ann. § 56:9–18 (West 1998).

Thus, based on the above analysis of judicial interpretation of federal antitrust law, plaintiffs have alleged facts sufficient to survive a 12(b)(6) motion with respect to their claim under New Jersey antitrust law.

### IV. Conclusion

For the above-mentioned reasons, the court holds that defendants' motion to dismiss for failure to state a claim upon which relief can be granted is **DENIED**.