{¶ 36} I respectfully disagree with the majority regarding the first assignment of error. Prior to commencing the peer review, a number of incidents occurred between Moore, the physicians within his practice, and Rubin in his capacity as Chief of the Department of Surgery. Rubin unsuccessfully attempted to join Moore and his partners in practice. Moore asserts that, after Rubin was denied partnership in the practice, he fervently began campaigning against Moore and his partners, attempting to attack their professional reputations. When the Magovern Group arrived, Rubin, as Chief of the Department of Surgery, began instituting widespread changes that affected Moore and the remaining original heart surgeons.
 {¶ 37} Instead of incorporating the existing surgeons into the Magovern Group, they were excluded. Specifically, Moore states that Rubin excluded Moore and his partners from the teaching program, meaning that they would no longer have residents assigned to assist them. Also, Rubin only permitted Magovern Group surgeons to use Operating Room 11, which was the most conducive to open heart surgery. Moreover, the hospital promoted only the new Magovern Group surgeons and did not refer to the existing surgeons in its media advertisements promoting the hospital's heart surgery program. Moore also asserts that Rubin and the hospital directed cardiologists and primary care physicians to refer their patients to only the Magovern Group surgeons, not to Moore or his partners.
 {¶ 38} In 1996, a peer review process was conducted by the hospital against Moore as a result of the death of one of his patients. The facts regarding that patient are as follows.
 {¶ 39} In October 1996, Richard Lanning, a nine-year-old boy, arrived in the emergency room, suffering from a neck wound caused by an arrow. Moore was assigned as the patient's treating vascular surgeon. Moore elected to treat the patient via telephone communication from his home to a resident at the hospital. The boy subsequently died as a result of his injury. As a result of the boy's death, Moore's privileges were temporarily suspended. Various levels of peer review were initiated, pursuant to the staff bylaws. The review commenced with a review of the child's case along with five other cases involving Moore. The Professional Executive Committee ("PEC") appointed an Ad Hoc Committee to review the cases. On December 16, 1996, the Ad Hoc Committee concluded that "it was difficult to state that [Moore's] vascular surgery skills can be significantly challenged."
 {¶ 40} The Ad Hoc Committee met again on January 7, 1997, and concluded that Moore's vascular privileges should not be limited. The Ad Hoc Committee issued a report stating, "[t]hese * * * case[s] do not represent, in our opinion, a problem with Dr. Moore's technical skills as a vascular surgeon." However, the Ad Hoc Committee noted, "[t]his is a serious breach of conduct and it is the Committee's opinion that disciplinary action other than the limitation of Dr. Moore's vascular privileges is appropriate." The hospital notified Moore on January 15, 1997, that the PEC would recommend that the Board of Trustees terminate Moore's vascular privileges.
 {¶ 41} Moore subsequently appealed the decision, and another peer review panel was appointed. On March 27, 1997, a hearing was conducted at Moore's request, pursuant to Article XII of the bylaws. A decision was issued stating, "[w]e conclude that the decision of the PEC to permanently terminate Dr. Moore's peripheral vascular privileges or any privileges was shown, by clear and convincing evidence, to be unreasonable andarbitrary." (Emphasis added.) Despite the hearing results, the PEC voted to recommend to the Board of Trustees that all clinical privileges of Moore and his membership on the medical staff should be terminated. On April 25, 1997, Moore was notified of the PEC's recommendation and his right to appeal. Moore then appeared before the hospital Board of Trustees on August 6, 1997. The Board concluded that only a letter of reprimand was in order. That letter was issued on August 7, 1997, stating, "[t]he Department Chair [Rubin] will be directed to closely monitor and periodically review your professional activity in the hospital to insure your continuing compliance with the requirements of this letter." Moore's privileges were then completely reinstated.
 {¶ 42} I respectfully disagree with the majority's conclusion that "all of the defendants' actions during this period are considered professional review actions and, as such, are covered under the HCQIA."
 {¶ 43} The language of the HCQIA states that it is meant to apply to professional review action that is taken against a single physician and not a group of physicians. Also, the specific standards set forth in the statute must be followed before immunity attaches. The sole purpose behind the limited immunity provided is to protect peer review bodies from monetary damages in suits brought by disgruntled, disciplined physicians, and to ensure that the peer review process is not being used as an abusive or retaliatory tool amongst bickering physicians.
 {¶ 44} The presumption that the statutory standards have been met does require that the plaintiff bear the burden of proving the professional review action did not comply with the enumerated standards.[1] However, as noted by the United States Court of Appeals for the Third Circuit, where a plaintiff makes extensive allegations regarding improprieties by physicians and others participating in the peer review, and those allegations, if proven true, would rebut the presumption of immunity under the HCQIA, dismissal of plaintiff's claim based on immunity is improper.[2]
 {¶ 45} In Brader v. Allegheny Gen. Hosp., the court held that the plaintiff alleged numerous instances of improprieties by physicians who were involved with the professional peer review process and those allegations were sufficient to rebut the presumption of immunity under the HCQIA.[3]
 {¶ 46} Although the instant case involves summary judgment and not a dismissal, the record reveals that Moore has alleged specific instances of improper behavior on behalf of Rubin and the hospital that went beyond the professional peer review, which are supported by the record. Moore also alleges specific incidents of other wrongful disciplinary action taken against Moore and his colleagues, outside of the peer review proceedings.
 {¶ 47} Moore cited several examples of behavior in which Rubin and the hospital sought to exclude Moore and his partners from fully participating in the new heart surgery program, including: limiting referrals to them; removing them from the teaching program; limiting operating room availability to them; and not including them in the marketing of the program. Thus, Moore has met the burden of overcoming the presumption in favor of immunity under the HCQIA.
 {¶ 48} Therefore, I disagree with the majority and would reverse the judgment of the trial court. Moore has met the burden regarding immunity under the HCQIA, and summary judgment is not appropriate.
 {¶ 49} Accordingly, I must dissent. The doctor is entitled to his day in court.
[1] Section 11112(a), Title 42, U.S.Code.
[2] Brader v. Allegheny Gen. Hosp. (C.A.3, 1995),64 F.3d 869.
[3] Id.