Gene W. MANZETTI, M.D. and Gene W. Manzetti, M.D., P.C., Appellants,

v.

The MERCY HOSPITAL OF PITTSBURGH, Edward T. Wenzke, Dr. Ronald V. Pellegrini, Dr. Ross R. Dimarco, Jr., Dr. Dennis Manning, Dr. Howard A. Zaren, Dr. William Hetrick, Dr. Joann V. Narduzzi, Dr.

**Mitchell Massie, Dr. Robert H. Boretsky, Dr. Chester A. Phillips, III, Dr. Richard J. Kuwik, Dr. Patrick J. Vlahos, Dr. Daniel R. Sullivan, Dr. Christopher A. Troianos, Dr. Mark Stypula, and Dr. Donna M.Lucas.**

Commonwealth Court of Pennsylvania.

Argued June 14, 1999.
Decided Nov. 29, 1999.

Peter Matthews Wright, Pittsburgh, for appellants.

Eric W. Springer, Pittsburgh, for appellees.

Before SMITH, J., PELLEGRINI, J., and NARICK, Senior Judge.

SMITH, Judge.

Dr. Gene W. Manzetti and Gene W. Manzetti, M.D., P.C. (Appellants) appeal from a decision of the Allegheny County Court of Common Pleas that granted partial summary judgment to The Mercy Hospital of Pittsburgh and individual doctors (Appellees) under the immunity provisions of the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. §§ 11101–11152, in a lawsuit filed by Appellants challenging the suspension of Dr. Manzetti's open-heart and vascular surgery privileges at the hospital. Appellants question whether Appellees are entitled to summary judgment under the immunity provisions of the HCQIA; whether Appellees are entitled to immunity under the HCQIA from claims of money damages; and whether the immunity provisions of the HCQIA preclude Appellants from taking discovery prior to the trial court's ruling on Appellees' motion for summary judgment.

I

Prior to February 11, 1994, Dr. Manzetti was privileged to perform all of the open-heart and vascular surgical procedures offered at Mercy Hospital. In August 1993, Dr. Mitchell Massie, a surgical resident at the hospital, expressed concerns to Dr. Ronald Pellegrini, who was then the Chief of the Division of Cardiac Surgery, about the quality of Dr. Manzetti's performance of open-heart surgery. Dr. Massie was

concerned because of the amount of open-heart intra-and-post-operative complications occurring among patients under Dr. Manzetti's care. In early January 1994, Dr. Ross DiMarco contacted Dr. Pellegrini and related to him a conversation he had with Dr. Manzetti in which Dr. Manzetti discussed various subjects, including his concerns about one of his patients who experienced atrial fibrillation and died post-operatively, about the prolonged periods of time that his patients remained on the open-heart machine and about low patient volume. Drs. Manzetti and DiMarco also discussed Dr. DiMarco's observations of Dr. Manzetti's judgment and skill.

Thereafter, on January 15, 1994, Dr. Pellegrini orally requested that Dr. Manzetti voluntarily cease performing open-heart surgery at the hospital. He nevertheless performed an operation on February 2, 1994, and during that operation the drug "protamine" was administered to the patient at a time when it was contra-indicated. Two days later, Dr. Pellegrini wrote a letter to Dr. Manzetti informing him that his open-heart surgery privileges at the hospital were suspended effective February 14, 1994 until further notice. The letter explained that the suspension was based upon review of Dr. Manzetti's clinical activity results and cited concerns about his lack of volume of open-heart surgeries, high operative mortality rate, high complication rate and excessive malpractice rates.

After receiving the letter, Dr. Manzetti complained to the hospital's legal department that Dr. Pellegrini's action was not authorized under the hospital's bylaws. The hospital's Medical Executive Committee (MEC) met on February 11, 1994 to review Dr. Pellegrini's summary suspension of Dr. Manzetti, which was three days before the effective date mentioned in Dr. Pellegrini's letter. Based on Dr. Pellegrini's explanation of his action, the MEC upheld the suspension of Dr. Manzetti's open-heart surgery privileges. The MEC also elected to initiate an investigation into

the matter and to reconvene on February 24, 1994 to discuss the results of the investigation. Dr. Manzetti was notified of the MEC's decision.

Two members of the MEC, Dr. William Hetrick, an anesthesiologist, and Dr. Dennis Manning, a cardiologist, gathered and analyzed data for statistical analysis of Dr. Manzetti's surgical complication rates. Although neither member had formal training in statistics, they developed and presented various statistical information at the February 24 meeting. A general surgeon and an orthopedic surgeon were appointed to examine the medical records of 26 open-heart surgeries performed by Dr. Manzetti, and the two doctors specifically reported on five of his cases at the meeting. Finally, Dr. Hetrick interviewed eight members of the hospital's anesthesia department, and he presented their written statements. Following review and discussion on February 24, the MEC voted unanimously to continue Dr. Manzetti's suspension.

Dr. Manzetti was notified of the MEC's decision. He thereafter requested and was granted a hearing before a panel of three physicians pursuant to the hospital's bylaws. Hearings were held on May 14, October 25 and October 26, 1994. Both the MEC and Dr. Manzetti were represented by counsel at the hearings. The MEC presented testimony from Dr. Pellegrini, Dr. Massie, Dr. DiMarco, Dr. Hetrick, Dr. Manning, eleven other doctors and the supervisor of the hospital's Cardiovascular Surgical Care Unit. Dr. Manzetti testified on his own behalf and presented testimony from two expert statistical witnesses, the manager of the hospital's Quality Management Department and three other doctors. Dr. Manzetti was afforded an opportunity to cross-examine The MEC's witnesses. During the hearing, Dr. Manzetti stated that he would no longer perform open-heart surgery alone.

On December 5, 1994, the hearing panel issued a recommendation in favor of the MEC. The panel gave no credence to the

statistical evidence and interpretations thereof presented by the MEC. However, the panel felt that a number of circumstances justified the suspension of Dr. Manzetti's surgical privileges. The fact most significant to the panel was his admitted low annual volume of open-heart surgeries, which had persisted for over ten years. The panel found that Dr. Manzetti's volume was inadequate to maintain the skills necessary for open-heart surgery. The panel also found that his failure to document complications was troubling and that his poor relationships with various professional personnel in the operating room were deleterious to the quality of patient care.

Appellants appealed the hearing panel's decision to a review panel, which heard argument from both counsel. On February 15, 1995, the review panel recommended that the Board of Trustees uphold Dr. Manzetti's suspension. The review panel also made a second recommendation and suggested that, subject to medical staff approval, Dr. Manzetti be given provisional open-heart surgery privileges for one year provided that he meet certain conditions, including assistance from senior help in the operating room.[1] The Board of Trustees upheld Dr. Manzetti's suspension and concluded that the review panel's second recommendation would not be in the best interest of the hospital's patients.

Prior to the review panel's decision, Appellants commenced their action in contract, trespass and equity against Appellees by writ of summons on February 2, 1995, seeking monetary damages and injunctive relief. A complaint was filed in April 1995. After discovery commenced, Appellees moved for summary judgment, and the trial court stayed discovery pending a decision on that motion. On November 12, 1996, the trial court granted Appellees' motion for summary judgment and dismissed all of Appellants' claims for monetary damages. The parties settled Appellants' claims for injunctive relief, and the trial court issued a final order on January 16, 1998.

## II

Appellate review of an order granting summary judgment is plenary; the same standard applies on appeal as before the trial court. *Albright v. Abington Memorial Hospital*, 548 Pa. 268, 696 A.2d 1159 (1997). Summary judgment is properly granted where "there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." Pa. R.C.P. No. 1035.2(1). After the close of discovery relevant to the motion, summary judgment is also appropriate if "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa. R.C.P. No. 1035.2(2).

An entry of summary judgment may be granted only in cases where the right is clear and free from doubt. *Davis v. Brennan*, 698 A.2d 1382 (Pa.Cmwlth.1997). The moving party has the burden of proving the non-existence of any genuine issue of material fact. *Id.* The record must be viewed in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Schnupp v. Port Authority of Allegheny County*, 710 A.2d 1235 (Pa.Cmwlth.

---

1. The record does not support Appellants' contention that Mercy Hospital admitted through counsel that Dr. Manzetti was competent to perform open-heart surgery with senior help. Counsel for Mercy Hospital argued that the only way Dr. Manzetti would be safe to perform open-heart surgery is with a senior open-heart surgeon present during the entire process. Counsel maintained that Mercy Hospital was not obliged to provide the senior help required by Dr. Manzetti, but it would not make that decision for another hospital.

1998). Parties seeking to avoid the imposition of summary judgment must show by specific facts in their depositions, answers to interrogatories, admissions or affidavits that there is a genuine issue for trial. *Sovich v. Shaughnessy*, 705 A.2d 942 (Pa. Cmwlth.1998).

■ The trial court's grant of summary judgment to Appellees was based on the immunity provisions of the HCQIA. The United States Congress enacted the HCQIA to remedy a nationwide increase in the occurrence of medical malpractice through effective professional peer review. The HCQIA immunity provisions protect professional review bodies, associated persons and their witnesses from liability "in damages under any law of the United States or of any State (or political subdivision thereof) with respect to" a professional review action.[2] 42 U.S.C. § 11111. In order to qualify for this immunity, the professional review body must take the professional review action:

(1) in the reasonable belief that the action was taken in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). Professional review actions are presumed to meet these four fairness requirements unless the presumption is rebutted by a preponderance of the evidence. *Id.* HCQIA immunity is a question of law for the court to decide once the record becomes sufficiently developed.

*Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d 1318 (11th Cir.1994).

■ The United States Court of Appeals for the Third Circuit has explained that this presumption creates an unusual standard for reviewing a summary judgment order under the HCQIA immunity provisions. *Mathews v. Lancaster General Hospital*, 87 F.3d 624. (3d Cir.1996). The Third Circuit stated that under the presumption language the plaintiff bears the burden of proving that the peer review process was not reasonable. *Id.* This Court followed the Third Circuit in *Gordon v. Lewistown Hospital*, 714 A.2d 539, 543 (1998), *appeal denied*, 558 Pa. 623, 737 A.2d 744 (1999), and explained that "[i]n an instance like this one, there is, first, on behalf of the hospital, a presumption of the validity of its disciplinary procedures. That presumption can only disappear if the doctor produces sufficient, credible evidence to prove that any of the four above-mentioned elements were not met." This is an objective standard and a defendant's bad faith is immaterial so long as the four fairness requirements are met. *Gordon*; *Mathews*; *Austin v. McNamara*, 979 F.2d 728 (9th Cir.1992).

### III

■ Appellants first argue that the actions taken by Dr. Pellegrini on February 4, 1994 and by the MEC on February 11 and February 24, 1994 affected Dr. Manzetti's hospital privileges and thus constitute professional review actions which must satisfy the four fairness requirements enunciated in the HCQIA. The Third Circuit in *Mathews* distinguished professional review "actions" from professional review "activities." The court explained that professional review actions are defined by 42 U.S.C. § 11151(9) and occur when a decision or recommendation by a peer review body "directly curtails a physician's clinical privileges or imposes some lesser sanction that may eventually·

**2.** The immunity does not apply to any law of the United States or any State relating to the civil rights of any person or persons. 42 U.S.C. § 11111(a).

affect a physician's privileges." *Mathews,* 87 F.3d at 633. The court further explained that activities which do not have such an affect on privileges but instead merely initiate a monitoring of the standard of care provided by a physician or factfinding into the adequacy of the physician's care are professional review activities which do not have to meet the four fairness requirements.

Appellants correctly argue that the actions of Dr. Pellegrini and the MEC represented professional review actions under the Third Circuit's analysis because each action affected his open-heart surgery privileges. However, the fact that these actions were taken summarily does not defeat Appellees' claim for immunity under the HCQIA. The act specifically contemplates summary suspensions and provides that the four fairness requirements are not to be construed to preclude "an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such action may result in an imminent danger to the health of any individual." 42 U.S.C. § 11112(c). Furthermore, the fairness requirements only mandate notice and hearing procedures "as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(4). Accordingly, the Court must consider the totality of the process to determine whether Appellees' professional review actions ultimately comported with the four fairness requirements. *Gordon; Mathews; Austin.*

■ When Dr. Pellegrini mailed the February 4, 1994 letter summarily suspending Dr. Manzetti's open-heart privileges effective in ten days, he had been approached by two colleagues concerned about the quality of Dr. Manzetti's performance. One of the colleagues was concerned about a case in which the patient died post-operatively, and a drug had recently been administered during one of Dr. Manzetti's surgeries at a time when it was contra-indicated. The MEC reviewed and confirmed Dr. Manzetti's suspension be-

fore it took effect, and it thereafter conducted an immediate investigation and reconvened to consider the suspension within two weeks of the time it went into effect.

The MEC's investigation included an attempt to statistically analyze Dr. Manzetti's performance, a review of Dr. Manzetti's cases and interviews of Dr. Manzetti, the chief of cardiovascular anesthesiology, all cardiac anesthesiologists, medical personnel who worked with Dr. Manzetti in the operating room and others within the hospital. After the MEC again confirmed Dr. Manzetti's suspension, he was afforded a full hearing before a hearing panel, which heard testimony from 24 witnesses and rendered a lengthy and detailed decision. That decision was reviewed by the review panel and the hospital's Board of Trustees. The Court notes that Dr. Manzetti apparently raised no objection to the adequacy of the hearing procedures afforded to him during the peer review process.

■ Appellants object to the methodology used in compiling the statistics presented at the MEC's February 24, 1994 meeting. Appellants point to an April 11, 1994 letter which suggests that the MEC based its decision in that meeting in part on the questioned statistics. Appellants next provide a lengthy critique of the statistical methodology with citations to the expert testimony that Dr. Manzetti produced before the hearing panel. Presumably, this is the testimony that led the hearing panel to give no credence to the MEC's statistical evidence and the interpretations of that evidence. Appellants contend that a jury might reasonably conclude that the statistical evidence misled the MEC in its deliberations. Appellants note that letters written to Dr. Manzetti by Dr. Pellegrini and Mr. Edward Wenzke prior to February 24, 1994 refer to statistical results, and they argue that a jury could conclude from these letters that the basis of his suspension was fabricated. These arguments severely misapprehend the Court's function in this matter.

■ It is not this Court's function to substitute its judgment for that of the peer

review body or to reweigh the evidence presented to the peer review body. *Gordon; Allison v. Centre Community Hospital,* 145 Pa.Cmwlth. 495, 604 A.2d 294 (1992); *Austin; Burney v. East Alabama Medical Center,* 939 F.Supp. 1514 (M.D.Ala.1996). Even an incorrect decision to suspend a physician will not disqualify the peer review body from immunity so long as the peer review action was taken in the reasonable belief that the suspension was warranted by the facts known after a reasonable effort was made to obtain the facts. *Austin.* To the extent that the statistical evidence was flawed, the expert testimony cited by Appellants and the hearing panel's ultimate rejection of this evidence amply demonstrate that Appellants were afforded a fair opportunity to challenge the evidence before the hearing panel. The mere existence of flaws in the methodology of the statistics does not render the peer review body's efforts to obtain the facts in this matter unreasonable.[3]

■■ Appellants also argue that letters mailed by Dr. JoAnn Narduzzi to St. Bernard's Regional Hospital and to the Arkan-

sas Medical Board in April 1994 demonstrate that the MEC's February 24, 1994 action was not warranted by the facts known at the time and was not taken in furtherance of quality health care. Dr. Narduzzi is the Vice–President/Medical Director of Mercy Hospital and is a member of the MEC. In the letter to St. Bernard's Regional Hospital, Dr. Narduzzi recommended that Dr. Manzetti was competent to perform seven open-heart procedures without conditions or restrictions and was competent to perform the remaining procedures with senior help. In the letter to the Arkansas Medical Board, Dr. Narduzzi wrote that Dr. Manzetti could perform open-heart surgery procedures if senior help were available. Dr. Pellegrini assisted Dr. Narduzzi in her completion of the forms for St. Bernard's Regional Hospital. Appellees contend that the letters were drafted with the language "with senior help" to alert St. Bernard's Hospital and the Arkansas Board of concerns regarding Dr. Manzetti without unduly prejudicing him during the interim between his summary suspension and the final action of the Board of Trustees.[4]

Appellants must rebut the presumption that the peer review action complied with

---

**3.** Appellants analogize this case to *Brown v. Presbyterian Healthcare Services,* 101 F.3d 1324 (10th Cir.1996), where the Tenth Circuit Court of Appeals upheld a trial court's refusal to grant immunity under the HCQIA. In that case the hearing panel reviewed the charts of only two patients and heard testimony from the physician who instituted the peer review proceedings and from the physician under investigation. As previously mentioned, the review panel in this case heard testimony from 24 witnesses. Accordingly, *Brown* is distinguishable. In addition, the Court is not persuaded by Appellants' contention that because of the short duration of the investigation Appellees' acted unreasonably and unfairly in suspending Dr. Manzetti's privileges. Courts that have considered cases under the HCQIA have not elucidated a litmus test in terms of the duration of an investigation before it is deemed reasonable. Rather the standard applied by the courts is reasonableness under the totality of the circumstances. *Gordon; Matthews; Austin.*

**4.** Appellants contend that the trial court abused its discretion by refusing to permit

Appellants to conduct further discovery before granting Appellees' motion for summary judgment. Appellants rely on *Brader v. Allegheny General Hospital,* 64 F.3d 869 (3d Cir. 1995), for the proposition that they are entitled to discovery. The Third Circuit's decision in *Brader* provides scant support for Appellants. The trial court decided that case on a motion to dismiss on grounds unrelated to the HCQIA. In rejecting the appellees' suggestion to affirm the trial court on HCQIA immunity grounds, the court merely remarked in passing that the HCQIA "implies some opportunity to discover relevant evidence." *Brader,* 64 F.3d at 879.

· Summary judgment may be entered prior to the completion of discovery where the material facts are undisputed, and, therefore, there is no issue of fact to submit to a jury. Pa. R.C.P. No. 1035.2 note. It is undisputed that Dr. Manzetti was afforded a full hearing with counsel and an opportunity to call and cross-examine witnesses, and he obtained many documents from the hospital during discovery. Appellants allege no material fact before

the four fairness requirements by a preponderance of the evidence. 42 U.S.C. § 11112(a); *Mathews.* To meet their burden, Appellants had to produce sufficient, credible evidence to demonstrate that Appellees failed to satisfy any of the fairness requirements of the HCQIA. *Id.* In light of the undisputed history preceding the initiation of this peer review action and proceeding throughout the process, the evidence proffered by Appellants fails to establish that Appellees' action was not reasonable and was not taken in furtherance of quality health care. Accordingly, the Court concludes that Appellees' peer review action was reasonable under the circumstances and comported with HCQIA requirements for professional peer review. The trial court's order is therefore affirmed.

### *O R D E R*

AND NOW, this 29th day of November, 1999, the order of the Court of Common Pleas of Allegheny County is affirmed.

this Court that could be brought out through discovery and could affect application of the immunity provisions. The record was sufficiently developed on all material facts to permit the court to properly resolve the legal question of HCQIA immunity. *Gordon; Bryan.* Accordingly, the Court concludes that the trial court did not abuse its discretion in

granting Appellees' motion for summary judgment without allowing Appellants further discovery. Moreover, the trial court's opinion discussing the motion for summary judgment is 36 pages in length and discusses the evidence in great detail. The omission of certain facts does not indicate that they were overlooked as Appellants contend here.