SUSAN MEYER, M.D., APPELLANT, *v.* SUNRISE HOSPITAL, A NEVADA CORPORATION, DBA SUNRISE HOSPITAL AND MEDICAL CENTER, RESPONDENT.

No. 31781

May 15, 2001

22 P.3d 1142

*Hale Lane Peek Dennison Howard & Anderson* and *Robert D. Martin, Noah G. Allison,* and *Elissa F. Cadish,* Las Vegas, for Appellant.

*Earley Savage* and *S. Brent Vogel,* Las Vegas, for Respondent.

# OPINION

By the Court, BECKER, J.:

## SUMMARY

This case arises out of Dr. Susan Meyer's treatment of Adolph Anguiano, a homeless patient who died on the premises of Columbia Sunrise Hospital and Medical Center (the "hospital") approximately two hours after Meyer had treated Anguiano and had him escorted from the premises by hospital security. Based on Meyer's alleged substandard treatment of Anguiano, Meyer was suspended and later went through the fair hearing process set forth in the hospital's bylaws. After three separate peer review committees reviewed the circumstances concerning Meyer's treatment of Anguiano, Meyer's staff privileges were revoked for a period of twelve months.

Thereafter, Meyer filed a breach of contract action against the hospital, alleging that her privileges were suspended out of fear of Consolidated Omnibus Budget Reconciliation Act ("COBRA") investigations and potential lawsuits, rather than in furtherance of quality patient care. The hospital moved to dismiss Meyer's complaint, arguing that the court lacked jurisdiction to hear the claim under state law and that its actions were immune under the Health Care Quality Improvement Act ("HCQIA"). After a year of discovery, the district court dismissed Meyer's action, ruling that the hospital's decision to suspend Meyer's privileges was reasonable under the circumstances, and that the hospital's actions were immune under HCQIA.

Meyer filed this timely appeal, alleging that the district court erred in dismissing her complaint. We disagree. We therefore affirm the order of the district court.

## STATEMENT OF THE FACTS

On July 28, 1995, Anguiano, a thirty-four-year-old man, was found lying unconscious in the wet grass of a Las Vegas hotel. Shortly thereafter, Anguiano was taken by ambulance to the hospital, where he was admitted into the emergency room at 8:03 a.m. and subsequently examined by Meyer.

Meyer observed that Anguiano was very dirty and that he had a foul body odor. Additionally, Meyer made the following notations on Anguiano's medical chart: (1) that he was homeless; (2) that he had not eaten in three days; (3) that he regularly smoked

cigarettes and drank alcohol and had smoked marijuana earlier that day; and (4) that his right rib hurt, as he had injured it in a fight several days earlier.

Meyer stated by affidavit that Anguiano had no significant complaints about his physical condition, except that he was hungry and thirsty. Meyer further stated that after she gave Anguiano a full physical, took his vital signs, and measured the oxygenation of his blood, she concluded that no additional tests were necessary. Meyer then gave Anguiano crackers and juice and had security escort him from the hospital.

According to Dr. Graham Wilson, head of Meyer's emergency room group and the Chair of the Department of Emergency Services at the hospital, Meyer treated Anguiano for a total of approximately seven minutes and gave him no follow-up instructions. Wilson further stated that the security officers had been so concerned about the "liability" associated with Anguiano's release that they asked Meyer to readmit Anguiano. Apparently, Meyer refused this request.

Approximately two hours later, at 10:10 a.m., Anguiano was found on hospital grounds in full cardiac arrest. Upon Anguiano's readmission to the emergency room, Meyer noted on Anguiano's chart that he had "obviously been dead for a while," and officially pronounced him dead at 10:18 a.m. Anguiano's autopsy, performed the following day, revealed that Anguiano likely died as a result of pneumonia. Meyer, however, disputes this autopsy report finding, stating by affidavit that it would have been impossible for Anguiano to have died of pneumonia one hour after his oxygenation level was ninety-two percent.

Later that morning, Wilson reviewed Anguiano's chart. Wilson testified in his deposition that he was very concerned about Meyer's treatment of Anguiano because he felt Meyer's documentation and seven-minute treatment was substandard and violated hospital rules and COBRA regulations. Wilson further testified that he let Meyer finish her shift because he "wasn't that concerned about her quality as a physician," and because she had worked for him for two years without any problems. At the end of Meyer's shift, Wilson called her into his office and summarily suspended her. Wilson then informed Meyer that she would undergo the fair hearing process and advised her to get legal counsel.

Prior to Wilson's meeting with Meyer, however, Wilson had met with Rick Kilburn, the hospital's Chief Operating Officer, who informed Wilson that there was no possibility that Meyer could continue working at the hospital. Kilburn discussed the possibility that Meyer's care of Anguiano might lead to another

COBRA investigation[1] or possibly a large lawsuit. Moreover, Wilson admitted in his deposition that Meyer would not be reinstated regardless of what happened in the fair hearing process because he had lost trust in her, and once "erratic behavior" like Meyer's occurred, there was a potential for it to happen again.

Despite the fact that Wilson admitted that he would not reinstate Meyer regardless of the recommendation made by the fair hearing committee, Wilson sent a letter to the Chief of Staff at the hospital, requesting a fair and unbiased review of Meyer's treatment of Anguiano. Wilson's letter set forth five areas of concern about this treatment: (1) none of Anguiano's documented complaints were addressed through diagnostic testing; (2) Meyer's medical charting was nonmedical and substandard; (3) Meyer failed to issue follow-up instructions; (4) a nurse had told Wilson that security had asked that Anguiano be readmitted because they were concerned about "liability"; and (5) Meyer made no effort to resuscitate Anguiano after he was in "full code."[2]

On August 29, 1995, Meyer had her hearing before the Fair Hearing Committee ("FHC") members, which included Drs. McPherson, Ahern, Cass, Freis, and Veinart. During the hearing, Kilburn expressed his concern over Meyer's notations on Anguiano's chart:

> [Y]ou have to consider the fact of how it looks on paper. You have a dirty, 34-year-old male, homeless, smoking pot and cough [sic]. Nothing's been done to be [sic] evaluate that. Homelessness and coughing. Nothing done. He's filthy, dirty, foul smelling. . . . Nothing else is wrong and nothing is done.

Other doctors, however, felt that Meyer's treatment of Anguiano was well within the standard of care. First, Wilson stated in his deposition that Dr. Jerry Goldberg, another hospital doctor, was adamant that Meyer had done nothing wrong. Additionally, Gary Young, an expert in the field of emergency room medicine, stated that Meyer acted within the standard of

---

[1] Dr. Frank Nemec, the hospital's Vice Chief of Staff, was also concerned that Meyer's treatment of Anguiano was a COBRA violation because it might be interpreted as a denial of care to an indigent patient. According to Wilson, Medicare had previously investigated the hospital for "patient dumping"—denying care to an indigent patient. This prior investigation arose out of another hospital doctor's alleged substandard treatment of an indigent patient who was suffering from a subdural hematoma and passed out at a casino shortly after being diagnosed with heat exhaustion and being released from the hospital.

[2] Meyer, however, denies that she was ever asked by security to readmit Anguiano and maintains that she had attempted to resuscitate Anguiano when he returned to the emergency room in full cardiac arrest.

care because Anguiano was in no acute distress and was clinically stable when Meyer evaluated him.

After reviewing Meyer's treatment of Anguiano, the FHC found that Meyer's suspension was warranted because her care of Anguiano was substandard, but concluded that Meyer should be reinstated because she had no prior work problems and because her "poor judgment" was not malicious.

Despite the FHC's recommendation, the Medical Executive Committee affirmed its decision to suspend Meyer's medical privileges with eligibility to reapply in twelve months. This decision was affirmed by the Appellate Review Committee ("ARC"), which included Drs. White, Fox, and Hippler. The ARC reviewed all prior proceedings for evidence, concluding, in part, that the professional review action taken was reasonable and in furtherance of quality health care.

On January 9, 1996, Meyer filed a civil action against the hospital alleging, in part, breach of contract and breach of the covenant of good faith and fair dealing. Thereafter, the hospital moved to dismiss Meyer's complaint, arguing among other things that Meyer's claims were barred by the HCQIA. The district court determined that it had jurisdiction over Meyer's claim provided that she was alleging a violation of the hospital's bylaws. Accordingly, the district court ordered further discovery so that it could ascertain whether Meyer had an actionable claim.

After one year of discovery, the hospital renewed its motion to dismiss, requesting that the court consider it as a summary judgment motion because Meyer had filed an affidavit from her expert and filed excerpts from deposition testimony. The affidavit of Meyer's expert, Dr. Rosen, an expert on emergency room medicine, concluded that Meyer's removal could not have been done in furtherance of quality health care, and thus Meyer's removal violated the hospital's bylaws.

After conducting a hearing, the district court granted the hospital's motion to dismiss, ruling that the hospital followed its own rules and that its decision was reasonable in view of the facts known to it at the time.

Thereafter, Meyer filed this timely appeal, alleging that the district court erred in dismissing her complaint.

### DISCUSSION

As a threshold matter, Meyer contends that the district court's dismissal of her complaint should be reviewed as an NRCP 12(b)(5) dismissal, rather than as a summary judgment. We disagree and review this matter as a summary judgment.

In *MacDonald v. Kassel,* 97 Nev. 305, 307, 629 P.2d 1200,

1200 (1981), we held that a district court order granting an NRCP 12(b)(5) motion to dismiss shall be reviewed as a summary judgment where the district court received and considered affidavits before ruling on the motion.

In the instant matter, the district court not only ordered discovery, but also considered an affidavit from Meyer's medical expert and several excerpts of deposition testimony before ruling on the hospital's motion to dismiss. Accordingly, in light of the holding in *MacDonald,* we will treat the district court's dismissal of this matter as a summary judgment since the district court considered evidence outside the pleadings.

Turning to the primary substantive issue on appeal, Meyer contends that the district court erred in granting summary judgment based on the conditional immunity provided under HCQIA. Specifically, Meyer contends that summary judgment was improper because she overcame the presumption that the hospital acted: (1) in furtherance of quality health care; (2) after a reasonable effort to obtain the facts; (3) after adequate notice and hearing; and (4) with the reasonable belief that action was warranted by the facts known at the time.[3] We disagree with Meyer's contention, and therefore affirm the district court order dismissing her complaint.

The interpretation of HCQIA is an issue of first impression in Nevada. Congress enacted HCQIA in 1986 "to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." H.R. Rep. No. 99-903 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, 6294. HCQIA provides conditional immunity for peer review action, essentially shielding the participants from liability in damages,[4] provided certain due

---

[3]The hospital argues, in part, that this court lacks jurisdiction to review decisions made by private hospital boards, citing *Lakeside Community Hospital v. Levenson,* 101 Nev. 777, 778, 710 P.2d 727, 728 (1985) ("The weight of judicial authority in this country denies judicial review of decisions of governing boards of private hospitals to appoint or remove members of their medical staffs."). To the extent that *Lakeside* would bar this court's consideration of whether a hospital board acted unconstitutionally or beyond the conditional immunity of the HCQIA, we hereby explicitly overrule it.

[4]We emphasize that the immunity provided under the HCQIA is not absolute. For example, actions brought under 42 U.S.C. § 1983 or Title VII of the Civil Rights Act of 1964 are excluded from the HCQIA's provision. *See Austin,* 979 F.2d at 733. Further, peer review actions that are determined to be outside the scope of 42 U.S.C. § 11112(a) lose any immunity the HCQIA would have provided.

process and fairness requirements are met. *See Austin v. McNamara,* 979 F.2d 728, 733 (9th Cir. 1992) (citing 42 U.S.C. § 11111).

Congress granted conditional immunity under HCQIA in an attempt to balance its concern for protecting physicians improperly subjected to disciplinary action with its concern over the chilling effect the fear of civil lawsuits would have on peer review. *See Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1322 (11th Cir. 1994).

Whether a hospital is entitled to summary judgment because of immunity under HCQIA is a "question of law for the court to decide whenever the record is sufficiently developed." *See Egan v. Athol Mem'l Hosp.,* 971 F. Supp. 37, 42 (D. Mass. 1997). Summary judgment under HCQIA, however, is somewhat unique in that this court's de novo review begins with a presumption that the peer review action met the standards set forth in HCQIA. *See* 42 U.S.C. § 11112(a). Additionally, the plaintiff challenging the decision of the review board bears the burden of overcoming this presumption. *See id.; see also Bryan,* 33 F.3d at 1318; *Austin,* 979 F.2d at 734. Therefore, in reviewing a motion for summary judgment based on HCQIA immunity, this court will affirm the grant of summary judgment unless a reasonable jury, viewing the facts in a light most favorable to Meyer, could conclude by a preponderance of the evidence that the hospital's actions fell outside the protection afforded by section 11112(a).

Section 11112(a) provides four requisites that must be satisfied before a peer review action is immune. The peer review action must be an action made: (1) in furtherance of quality health care; (2) after a reasonable effort to obtain the facts in the matter; (3) after adequate notice and hearing; and (4) in the reasonable belief that the action was warranted based on the facts known. 42 U.S.C. § 11112.

i. *In furtherance of quality health care*

The first requisite is satisfied provided that "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Bryan,* 33 F.3d at 1334-35 (citing H.R. Rep. No. 99-903, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6393). In making this evaluation, "the Court must not reweigh the evidence or substitute its own judgment for that of the peer review committee." *Egan,* 971

F. Supp. at 44 (citing *Bryan,* 33 F.3d at 1337). Further, because the "reasonableness" standard is objective, rather than subjective, the peer reviewer's subjective bias or bad faith is irrelevant. *See Bryan,* 33 F.3d at 1335; *Austin,* 979 F.2d at 734.

In the instant matter, Meyer argues that there is a triable issue of material fact concerning whether the peer review committee based its action on a reasonable belief that it was acting in furtherance of quality health care because: (1) Dr. Rosen, Meyer's medical expert, stated by affidavit that the hospital's decision was not based in furtherance of quality care or on any medical reason; and (2) there was evidence in the record that Meyer was terminated because of the hospital's concern over bad publicity, lawsuits, and COBRA investigations. We will address each of these arguments in turn.

### A. *Expert testimony*

With respect to expert testimony, we agree with the majority of jurisdictions that such testimony is irrelevant to our consideration of whether a peer review committee believed it was furthering quality health care in terminating a physician. *See Sugarbaker v. SSM Health Care,* 190 F.3d 905, 914 (8th Cir. 1999); *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 636 (3d Cir. 1996); *Imperial v. Suburban Hosp. Ass'n, Inc.,* 37 F.3d 1026, 1030 (4th Cir. 1994); *Egan,* 971 F. Supp. at 43. Expert testimony is irrelevant to our consideration of immunity under HCQIA because we focus solely on the reasonableness of the peer reviewer's belief, not on whether the peer review action ultimately proved to be medically sound or actually furthered quality care. *See Sugarbaker,* 190 F.3d at 914; *see also Manzetti v. Mercy Hosp.,* 741 A.2d 827, 834 (Pa. Commw. Ct. 1999) ("Even an incorrect decision to suspend a physician will not disqualify the peer review body from immunity" provided the requisites of section 11112(a) are satisfied.). Therefore, Meyer's proffer of expert testimony stating that the peer review action taken was not warranted and did not further quality care does not create a triable issue of material fact because it does not bear on the relevant issue for our consideration—namely, whether the peer review committee acted with a reasonable belief that its action was warranted by the facts known after a reasonable investigation.

Meyer relies heavily on *Brown v. Presbyterian Healthcare Services,* 101 F.3d 1324 (10th Cir. 1996). While *Brown* does discuss the use of expert testimony in evaluating issues of immunity under HCQIA, the decision in *Brown* centered upon the fact that Dr. Brown was able to produce significant evidence to support her allegations that information submitted by the defendants in her

medical review process was false or misleading. Indeed, Dr. Brown produced evidence that the individuals who investigated her actions were involved in encouraging another doctor to move his practice so as to be in direct competition with her. In other words, the defendants in *Brown* had conspired to manufacture allegations of improper behavior by Dr. Brown so as to put Dr. Brown out of business. In this setting, Dr. Brown's expert concluded that the defendants were not acting to further quality health care. Neither were their actions reasonable under the facts of the case. It was for this reason that the federal district court in *Brown* refused to grant summary judgment on the basis of HCQIA immunity, a decision that was affirmed by the United States Court of Appeals for the Tenth Circuit.

Such facts do not exist here. There is no evidence or allegation that the doctors who evaluated Meyer's performance in treating Anguiano were manufacturing or exaggerating facts to support disciplinary sanctions. The Fair Hearing Committee found that Meyer's suspension was warranted because her care of Anguiano was substandard. Given this finding, the Medical Executive Committee and the Appellate Review Committee had an objective basis for concluding that Meyer's privileges at the hospital should be suspended for a period of twelve months.

The fact that the FHC recommended reinstating Meyer's privileges because this was a first offense and she did not act out of malice is irrelevant to the issue of immunity under HCQIA. The issue is not whether doctors can disagree over the severity of the disciplinary action, or whether a judge or jury believes the penalty was too harsh. This decision, if supported by objective evidence, is within the discretion of a professional review committee under the HCQIA. This is precisely why the United States Courts of Appeal for the Third, Fourth, Ninth and Eleventh Circuits have concluded that issues of immunity should generally be decided by the court through the use of summary judgment motions. *See generally, Mathews v. Lancanster General Hospital,* 87 F.3d 624 (3d Cir. 1996); *Imperial v. Suburban Hospital Association, Inc.,* 37 F.3d 1026 (4th Cir. 1994); *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318 (11th Cir. 1994); *Austin v. McNamara,* 979 F.2d 728 (9th Cir. 1992).

Absent evidence that an evaluation was misleading, false or otherwise defective, a dispute between experts over the standard of care or the decision to impose discipline is insufficient to overcome the presumption that individuals acting pursuant to HCQIA standards are entitled to immunity from monetary damages under the Act.

In the present matter, we are confident that the peer review committee acted with a reasonable belief that they were furthering quality care. We cannot say that these physicians did not reasonably believe that they were furthering quality care in suspending Meyer because their review focused on Meyer's alleged substandard treatment of Anguiano, a patient who allegedly died of pneumonia less than two hours after Meyer treated and released him.

Accordingly, because HCQIA provides that the peer review action need not be correct, if it is taken with a reasonable belief that it was made in furtherance of quality care, we conclude that Meyer's expert testimony was not sufficient to overcome the presumption that the hospital acted with the reasonable belief that it was furthering quality care.

### B. *Subjective bias of the peer review committee*

Meyer further argues that the hospital did not act in furtherance of quality health care because its decision to suspend her privileges was made based on the hospital's fear of lawsuits and COBRA investigations.

Similar allegations have been made by other physicians trying to overcome the presumption of qualified immunity under HCQIA. In *Mathews,* 87 F.3d at 634-35, a physician claimed that his privileges were suspended because some of the members of the peer review committee were the doctor's economic competitors. The *Mathews* court rejected the physician's claim about subjective bias, reasoning that Congress had explicitly disaffirmed a subjective ''good faith'' standard for reviewing HCQIA immunity, and instead opted for an objective ''reasonable belief'' criteria.[5] *See id.* at 635 (citing the House Committee on Energy and Commerce Report on the HCQIA, H.R. Rep. No. 99-903 at 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 6392-93 (omitting a ''good faith'' standard out of concern that it would be misinterpreted)). Similarly, in *Egan,* the court rejected a physician's allegations that the peer review committee's decision was based on economic motives because there was no evidence to show that anyone exaggerated or manufactured complaints against the doctor. 971 F. Supp. at 44.

---

[5]We recognize that there will be instances where the subjective motives of the peer review committee will be relevant in determining HCQIA immunity. For example, when a doctor alleges that she was disciplined because of her race, religion, or sex, or in matters where there is seemingly no objectively reasonable evidentiary basis for imposing discipline.

Like the physicians in *Mathews* and *Egan,* Meyer has failed to provide any evidence that the peer review committee's decision was based on anything other than Meyer's treatment of Anguiano. Although Meyer notes that Wilson and Kilburn were concerned about potential COBRA violations and potential lawsuits, these concerns related to quality health care. Indeed, the purpose behind the COBRA regulatory scheme is to ensure quality health care and prevent discrimination against homeless patients or those patients who cannot afford to pay for treatment. The hospital had already been sanctioned for refusing to properly treat indigents. The peer review professionals were then faced with the findings of the FHC that Meyer's treatment of Anguiano was substandard and facts from which an objective observer could conclude that Meyer failed to treat Anguiano's complaints seriously because of his homeless condition and general appearance. If a doctor's personal attitude towards a homeless patient affects his or her professional judgment, this is an issue of quality health care. There is objective evidence to support a conclusion that this is precisely what happened with Meyer. While we agree that the hospital could have imposed a lesser sanction, they are not required to do so under HCQIA. Because there was a reasonable evidentiary basis for the committee's decision in this matter, Meyer's allegations concerning the subjective beliefs of Wilson and Kilburn are insufficient to overcome the presumption of reasonableness.

Accordingly, we conclude that Meyer has failed to proffer relevant evidence that would overcome the presumption that the hospital acted in furtherance of quality health care.

ii. *After a reasonable effort to obtain the facts in the matter*

With respect to the second HCQIA requisite, Meyer contends that the hospital made an insufficient effort to obtain the facts in this matter because the peer review committee decided to terminate Meyer's privileges based on a single chart—Anguiano's—rather than on Meyer's entire work history at the hospital. Meyer also relies upon *Brown v. Presbyterian Healthcare Services* in support of this contention. We conclude that Meyer's contention lacks merit.

In reviewing the "facts in the matter," the peer review committee is required to consider only those facts upon which the professional review action is based. *See Fobbs v. Holy Cross Health Sys. Corp.,* 789 F. Supp. 1054, 1065 (E.D. Cal. 1992). In *Brown,* the court concluded, in part, that a reasonable investigation into the "facts in the matter" had not been made because the review

committee had based its decision solely on two charts, which the court deemed unreasonably narrow and insufficient to support its conclusion that a physician posed a threat to patient safety. 101 F.3d at 1334.

We conclude that the instant investigation was distinguishable from the investigation in *Brown* since the physician in *Brown* was suspended because of general concerns for her overall quality of patient care reflected in her patients' charts. 101 F.3d at 1327. Moreover, as we previously noted, there was substantial evidence in *Brown* that the premise for suspension was false and that witnesses presented false or misleading evidence regarding the two charts. In contrast, Meyer's privileges were suspended based on a single incident of alleged substandard patient care. Because the professional review action was based on Meyer's conduct arising from a single incident, a review of her other patients' medical charts was unnecessary. Further, we cannot see how a review of Meyer's treatment of other patients would have been relevant to the peer review process in light of the fact that the hospital did not dispute, and actually considered, Meyer's two-year record of proper patient care before making its determination.

Accordingly, we conclude that Meyer has failed to proffer sufficient evidence to overcome the presumption that the peer review committee acted only after a reasonable effort to obtain the facts in this matter.

### iii. *After adequate notice and hearing*

With respect to the third HCQIA requisite, Meyer contends that she did not receive an adequate hearing because the review process was a "sham," as the decision to terminate her had been made long before she went through the peer review process. We conclude that this contention lacks merit because the record reveals that Meyer received adequate notice and a meaningful hearing.

Section 11112(b) of HCQIA sets forth "safe harbor" requirements concerning notice and hearing procedures that a health care provider must satisfy to meet the requirement of section 11112(a)(3). *See Bryan v. James E. Holmes Regional Med. Cntr.,* 33 F.3d 1318, 1335 (11th Cir. 1994). Essentially, section 11112(b) requires that the medical facility provide the physician with adequate notice of the hearing, including the proposed action to be taken and a summary of the physician's rights to be afforded at the hearing. The physician's rights afforded at the hearing, set forth in section 11112(b)(3), include the right to: (1) representation by counsel; (2) have a record made of the proceedings; (3) call and cross-examine witnesses; (4) submit a written closing

statement; and (5) receive a written decision by the health care entity.

In the instant matter, our review of the record provides no evidentiary support for a contention that the hospital violated the notice and hearing protections afforded by HCQIA. Meyer received proper notice of the hearing, was represented by counsel, and was allowed to advocate that her treatment of Anguiano was reasonable. The record reflects that the FHC doctors fairly considered her claims, particularly in light of their conclusion that a suspension was too severe a sanction for the substandard treatment.

Accordingly, we conclude that Meyer has failed to overcome the presumption that the hospital provided her with adequate notice and a proper hearing.

iv. *With the reasonable belief that action was warranted by the facts known*

With respect to the fourth HCQIA requisite, Meyer again reiterates her argument that the hospital's action was unreasonable because it was instituted out of fear of COBRA investigations and lawsuits, rather than based on a reasonable belief that disciplinary action was warranted. We conclude that Meyer has proffered insufficient evidence that the review process undertaken was a "sham."

Peer review must be made with the "reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain the facts." 42 U.S.C. § 11112(a)(4). In *Bryan,* the court held that a reasonable effort had been made to obtain the facts because three separate committees reviewed submitted reports to a board, which made its decision based upon the documentary record developed during the peer review proceedings. 33 F.3d at 1335.

Here, like in *Bryan,* three separate committees reviewed the suspension of Meyer's privileges, referencing Meyer's failure to treat Anguiano as the basis for their decision to suspend or discipline Meyer. Although two doctors had expressed their fears of COBRA violations and lawsuits, these doctors were not on the committees that reviewed Meyer's treatment of Anguiano. Further, there was no mention of such fears in the written conclusions issued by the committees, rather their written conclusions focused on the treatment of Anguiano.

We therefore conclude that the hospital conducted a reasonable investigation to obtain the facts concerning Meyer's treatment of Anguiano. We have in our consideration of the first HCQIA req-

uisite also concluded that the peer review action was made with a reasonable belief that it was warranted based on these facts.

Accordingly, we conclude that Meyer has failed to overcome the presumption that the hospital acted with the reasonable belief that action was warranted based on the facts known.

## CONCLUSION

We conclude that the district court did not err in granting summary judgment.[6] Meyer has failed to overcome the presumption that the peer review action met the requisites set forth in section 11112. We therefore affirm the order of the district court.[7]

YOUNG, and AGOSTI, JJ., concur.

MAUPIN, C. J., concurring:

Given the stringency of the standard for review under HCQIA,[1] we are compelled to affirm. *Brown v. Presbyterian Healthcare Services,*[2] the case authority upon which Dr. Meyer primarily relies, does not support reversal. *Brown* did not hold that conflicting affidavits create issues of fact under HCQIA. Rather, *Brown,* correctly applying the standard for review under HCQIA, found no immunity because the premise for the discipline imposed by the peer review process in that case was false on its face. The incident upon which Dr. Meyer was terminated does not suffer from the same defect of proof. Thus, although termination of Dr. Meyer because of a single incident of improper care seems excessive, I must concur with the result reached by the majority.

---

[6]Without cross-appealing and without requesting attorney fees before the district court, the hospital asks this court to award it attorney fees pursuant to HCQIA § 11113, which provides for attorney fees when litigation of a claim was "frivolous, unreasonable, without foundation, or in bad faith." We do not reach the issue of whether attorney fees are proper because this court lacks jurisdiction to hear the claim. *See Sierra Creek Ranch v. J. I. Case,* 97 Nev. 457, 460, 634 P.2d 458, 460 (1981) (providing that this court will not consider issue of attorney fees without a filing of a cross-appeal); *see also Montesano v. Donrey Media Group,* 99 Nev. 644, 650 n.5, 668 P.2d 1081, 1085 n.5 (1983) (noting that arguments raised for the first time on appeal will not be considered).

[7]THE HONORABLE MYRON E. LEAVITT, Justice, voluntarily recused himself from participation in the decision of this matter.

[1]*See Sugarbaker v. SSM Health Care,* 190 F.3d 905 (8th Cir. 1999); *Manzetti v. Mercy Hosp.,* 741 A.2d 827 (Pa. Commw. Ct. 1999); *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624 (3d Cir. 1996); *Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318 (11th Cir. 1994); *Imperial v. Suburban Hosp. Ass'n, Inc.,* 37 F.3d 1026 (4th Cir. 1994); *Austin v. McNamara,* 979 F.2d 728 (9th Cir. 1992).

[2]101 F.3d 1324 (10th Cir. 1996).

SHEARING, J., with whom ROSE, J., agrees, concurring:

I must concur in the result reached in the majority opinion because HCQIA sets such a low threshold for granting immunity to a hospital's so-called peer review. Basically, as long as the hospitals provide procedural due process and state some minimal basis related to quality health care, whether legitimate or not, they are immune from liability. Unfortunately, this may leave the hospitals and review board members free to abuse the process for their own purposes without regard to quality medical care. This is particularly probable since most courts have indicated that the legislative history of HCQIA bars consideration of the subjective motives or biases of peer review boards.

Here, hospital administrators, immediately upon recognizing a public relations problem, decided that Dr. Meyer was to be the hospital's scapegoat for the unfortunate death of a patient. The testimony showed that the administrators decided to fire her long before any so-called peer review. The real opinion of her ability is made clear by the fact that they allowed her to continue to take care of patients and finish her shift because they were not "that concerned about her quality as a physician," because she had worked for them for two years without any problems.

Unfortunately, the immunity provisions of HCQIA sometimes can be used, not to improve the quality of medical care, but to leave a doctor who is unfairly treated without any viable remedy.